The STATE of Ohio, Appellee,

v.

RETHERFORD, Appellant. ▮

[Cite as *State v. Retherford* (1994), 93 Ohio App.3d 586.]

Court of Appeals of Ohio,
Montgomery County.

No. 13987.

Decided March 16, 1994.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Carley J. Ingram,* Assistant Prosecuting Attorney, Appellate Division, for appellee.

*Gary C. Schaengold,* for appellant.

---

BROGAN, Judge.

Defendant-appellant, Barbara A. Retherford, appeals from her conviction of drug abuse in the Common Pleas Court of Montgomery County.

The underlying facts of the case are as follows. On June 23, 1992, at 9:13 a.m., Deputy Sandy Debrosse of the Montgomery County Sheriff's Department was operating a routine traffic post/drug interdiction in a marked patrol car on northbound I–75 along with Deputy Ronald Newsome, who was stationed in another patrol car a few miles north of Deputy Debrosse.

Deputy Debrosse clocked Retherford's vehicle at seventy-one m.p.h. in a fifty-five m.p.h. speed zone. Deputy Debrosse advised Deputy Newsome of the speed violation by radio, and Deputy Newsome made the stop of Retherford's vehicle. It is undisputed that Retherford was exceeding the posted speed limit.

Deputy Newsome left his car and approached Retherford's vehicle. He testified that Retherford seemed nervous, but not overly so. In fact, Deputy Newsome admitted that the degree of Retherford's nervousness was reasonable for an average person pulled over for a traffic violation.

Deputy Newsome asked Retherford for her driver's license and registration, which she produced. Deputy Newsome then returned to his patrol car. Deputy Debrosse arrived as Deputy Newsome was in the process of writing Retherford a warning ticket for excessive speed. Deputy Newsome testified that he waited in his cruiser for Deputy Debrosse to arrive so that he could have a backup for officer-safety reasons, and also so that he would have a witness when he asked for Retherford's consent to search her vehicle.

Once he finished writing the warning ticket, Deputy Newsome got out of his cruiser, approached Deputy Debrosse, and explained to her that he was "going to have Ms. Retherford step out of her car and * * * issue her a warning citation for speeding and * * * attempt to search to look for drugs and other contraband in the vehicle." Deputy Newsome testified that it is not normal procedure to have an individual exit his or her vehicle when issuing a traffic citation, but that as part of his drug interdiction training he was taught to "get the people separated from their vehicle."

After Retherford was asked to get out of her vehicle, and while she was standing in the presence of the two uniformed officers, Deputy Newsome began what he described as a "casual conversation" with Retherford as part of his "technique," so that he could "basically [view] her body language and her nervousness and so on." During his "conversation" with Retherford, Deputy Newsome noticed that Retherford had some luggage in the back seat of the car. The presence of the luggage prompted Deputy Newsome to engage Retherford in a "conversation" about her travel plans and destination. This so-called "conversation" appears to have consisted mostly of questions from Deputy Newsome. Deputy Newsome gathered from his questioning of Retherford that she was travelling from Cincinnati to Port Clinton to visit her boyfriend.

Deputy Newsome described the activity at the conclusion of the Retherford traffic stop as follows:

"I completed the traffic citation, gave the citation to her, driver's license and her vehicle registration back to her, and as part of my technique, I then continue on the conversation in a casual manner. Once she receives her paperwork back,

and I'm concluding the conversation, I say you're now free to go, or you can go ahead and take off, and whatever the case may be. In this particular case, I remember telling her [']* * * you have a nice day, you're free to go.['] At that point, as I was taught, Ms. Retherford would turn back to her vehicle. As soon as she turned and took one step, I said, 'Excuse me, can I ask you one thing before you go,' and at that point she said, 'Sure.' I said, 'Are you carrying any large sums of money, drugs, or any weapons.' She stated, 'No, no, I'm not.' I said, 'Would you mind if I search your vehicle and contents to be sure there is no contraband in the vehicle,' and she said * * * 'Sure, go ahead.'"

After Deputy Newsome obtained Retherford's consent to search her car, he opened an overnight bag in the back seat and found a cake tin inside of which he found marijuana and marijuana pipes. Upon making this discovery, Deputy Newsome placed Retherford under arrest for possession of marijuana and drug paraphernalia, patted her down, handcuffed her, and placed her in custody. When Retherford expressed concern about an unsigned check in her purse, Deputy Debrosse retrieved the purse and checked it for any additional contraband. Inside the purse, Deputy Debrosse found a pill tin with two suspected blotter acid hits.

Deputy Debrosse and Deputy Newsome both filled out utility reports, a written narrative of the events which transpired during the traffic stop. Neither report included the fact that Deputy Newsome told Retherford she was free to go. However, Deputy Newsome testified that he advised Retherford that she was free to proceed on her way, and Deputy Debrosse testified that she heard Deputy Newsome make that statement. It is undisputed that Retherford was not advised that she did not have to consent to the search of her vehicle, nor was any written waiver of rights form used.

Deputy Newsome testified that the presence of "indicators," *i.e.*, the fact that Retherford's luggage was in the back seat and not in the trunk,[1] the fact that Retherford was nervous ("but not overly so"), and the fact that she was going from Cincinnati to Port Clinton, raised some mild suspicion that there might be "contraband" in the car. However, when asked why he felt the need to ask Retherford for her consent to search her vehicle, Deputy Newsome replied, "[m]ore so for any other reason the fact that I need the practice, to be quite honest." Deputy Newsome further testified that, in 1992 alone, he asked for

---

1. Ironically, in another, similar case in this court, the officer testified that his suspicions were raised partially by the fact that the detainee had his luggage in the trunk. *State v. Medina* (Apr. 13, 1994), Montgomery App. No. 13883, unreported, discretionary appeal not allowed in (1994), 70 Ohio St.3d 1413, 637 N.E.2d 10. For an enlightening exposition of some of the many internal inconsistencies in the drug courier profiles, see Cloud, Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas (1985), 65 Boston U.L.Rev. 843.

consent to search a vehicle incident to a traffic stop "approximately 786 times
* * * give or take a few."

On August 27, 1992, Retherford was indicted for one count of drug abuse in
violation of R.C. 2925.11(A) for possession of LSD, a Schedule I controlled
substance.

Retherford entered a plea of not guilty. On December 29, 1992, Retherford
filed a motion to suppress evidence, which the trial court overruled on January
27, 1993.

Retherford thereafter entered a plea of no contest to the indictment. The trial
court imposed a suspended sentence of one year and placed Retherford on
probation for a period not to exceed three years. This appeal followed.

A brief was filed by appointed counsel on Retherford's behalf on September 1,
1993. The appellate brief is ostensibly an *Anders* brief wherein appellate counsel
usually indicates that in counsel's judgment there are no meritorious appellate
issues. See *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d
493. Thus, while an *Anders* brief generally contains no assignments of error,
Retherford's brief contains a cursory argument that the trial court erred in
denying Retherford's motion to suppress.

Retherford's motion to suppress addressed the evidence seized by the deputies
during the search of her vehicle and personal belongings and claimed that the
warrantless search was unconstitutional under both the United States and Ohio
Constitutions.

The trial court found that the deputies had a valid reason for the initial stop,
that Retherford was not in custody after being told by Deputy Newsome that she
was free to leave, that Retherford's consent to allow the search of her vehicle and
its contents was freely and voluntarily given, and that the search of her purse was
valid as a search incident to a lawful arrest. Based on these conclusions, the trial
court found that the search was not illegal and overruled Retherford's motion to
suppress.

■ In a motion to suppress, the trial court assumes the role of the trier of
fact, and, as such, is in the best position to resolve questions of fact and evaluate
the credibility of the witnesses. *State v. Clay* (1972), 34 Ohio St.2d 250, 63 O.O.2d
391, 298 N.E.2d 137. Accordingly, in our review, we are bound to accept the trial
court's findings of fact if they are supported by competent, credible evidence.
Accepting those facts as true, we must independently determine as a matter of
law, without deference to the trial court's conclusion, whether they meet the
applicable legal standard.

The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated * * *." These provisions grant to the citizens of Ohio what is among our most cherished of constitutional rights.

"The basic purpose * * * [of these constitutional provisions] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court of the City and Cty. of San Francisco* (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935. The fundamental nature of this guarantee has long been noted:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Ry. Co. v. Botsford* (1891), 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734, 737.

As Justice Brandeis expressed in words which continue to animate and inspire our vision of the great privilege of American citizenship as much today as they did almost seventy years ago:

" * * * The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Olmstead v. United States* (1928), 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (Brandeis, J., dissenting).

As a result of Deputy Newsome's testimony in this case, and of testimony in other cases currently pending before this court, it has become clear to us that some police agencies in Ohio are instructing their officers to routinely ask for the consent of individuals stopped for traffic violations to search their vehicles and its contents for drugs, weapons, or large sums of money, even when the officer has little or no suspicion that the occupants of the vehicle are engaged in any criminal

activity whatsoever, or that the vehicle itself contains any contraband.[2]

What is obviously troubling about these cases is that hundreds, and perhaps thousands [3] of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their right to privacy in their automobiles and luggage, sometimes for no better reason than to provide an officer the opportunity to "practice" his drug interdiction technique.

While we recognize the importance of drug interdiction, we are shocked by what we believe to be an unjustified and egregious intrusion upon the privacy rights of the citizens of Ohio. As Professor Ely has noted, "[a] major point of the [Fourth Amendment], obviously, was to keep government from disrupting our lives without at least moderately convincing justification." Ely, Democracy and Distrust: A Theory of Judicial Review (1980) 96.

The United States Supreme Court has identified three categories of police contact with persons. The first is referred to as a "consensual encounter," in which there is no restraint on the person's liberty. There need be no objective justification for such an encounter.[4] The second type, called "detention," involves

---

**2.** See *State v. Foster* (1993), 87 Ohio App.3d 32, 621 N.E.2d 843 (Ohio State Highway Patrolman told individual detained for a traffic stop that he was free to leave and then, absent reasonable suspicion of criminal activity, officer requested consent to search vehicle); *State v. Clark* (July 26, 1991), Lucas App. No. L–90–315, unreported, 1991 WL 137012 (same as above); *State v. Pinder* (Dec. 15, 1993), Miami App. No. 93 CA 6, unreported, 1993 WL 518692 (same); see, also, Rotenberg, Consent(less) Police Searches (1991), 69 Wash.U.L.Q. 175, 190 (practice of asking for consent to search during traffic stops in the absence of articulable suspicion widespread).

**3.** Deputy Newsome, a Montgomery County Sheriff's Deputy, admitted to requesting consent to search as a matter of course in approximately seven hundred eighty-six traffic stops in 1992 alone. If we multiply this among all agencies and officers who are currently routinely using this practice to gain consent to search the vehicles of citizens they suspect of no crime, the numbers of individual citizens being asked to relinquish their privacy rights in the name of "voluntary cooperation" with the government is staggering.

**4.** The United States Supreme Court stated in *Florida v. Bostick* (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398: "[W]e have held repeatedly that mere police questioning does not constitute a seizure[.] * * * '[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' " Citing *Florida v. Royer* (1983), 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (plurality opinion). Moreover, "[w]e have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, see *INS v. Delgado*, 466 U.S. 210, 216 [104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 255] (1984); * * * ask to examine the individual's identification, see *Delgado, supra*, 466 U.S., at 216 [104 S.Ct., at 1762, 80 L.Ed.2d, at 255]; *Royer, supra*, 460 U.S., at 501 [103 S.Ct., at 1326, 75 L.Ed.2d, at 238–239] (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 557–558 [100 S.Ct. 1870, 1878–1879, 64 L.Ed.2d 497, 511–512] (1980); and request consent to search his or her luggage, see *Royer, supra*, 460 U.S., at 501 [103 S.Ct., at

a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur "if there is an articulable suspicion that a person has committed or is about to commit a crime." The third type involves seizures in the nature of an arrest, which may occur only if the police have probable cause to arrest a person for a crime. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. See, also, *State v. Morris* (1988), 48 Ohio App.3d 137, 138, 548 N.E.2d 969, 970, citing *United States v. Poitier* (C.A.8, 1987), 818 F.2d 679.

Police officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated. *Royer, supra,* 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 235–236. However, police officers may not detain an individual, "even momentarily," without "reasonable, objective grounds for doing so." *Id.,* 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. See, also, *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271, 1272–1273. Once there is a detention, that is, a "seizure," the Fourth Amendment, is implicated. "[A] person has been seized for the purposes of the Fourth Amendment when a law enforcement officer, by means of physical force or show of authority, has in some way restrained his [or her] liberty such that a reasonable person would not feel free to walk away."[5] *Id.; United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509; *Terry v. Ohio* (1968), 392 U.S. 1, 16, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905, fn. 16. In order to justify a seizure of the magnitude of a limited investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonable warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. See, also, *State v. Williams* (1990), 51 Ohio

---

1326, 75 L.Ed.2d, at 238–239] (plurality opinion)—as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick, supra,* 501 U.S. at 434–436, 111 S.Ct. at 2386, 115 L.Ed.2d at 398–399.

**5.** The United States Supreme Court has articulated several versions of its test for what constitutes a seizure for Fourth Amendment purposes. In *California v. Hodari D.* (1991), 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690, 698, the court held that no seizure occurs so long as a reasonable person would feel free "to disregard the police and go about his business." In *Florida v. Bostick* (1991), 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389, the court held the "free to leave" analysis inapplicable to suspicionless bus searches based on consent, and stated that the "crucial test" for determining a seizure was whether, in light of all the circumstances, the police conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.,* 501 U.S. at 437, 111 S.Ct. at 2387, 115 L.Ed.2d at 400, citing *Michigan v. Chesternut* (1988), 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565, 569, and *Hodari D, supra,* 499 U.S. at 626–628, 111 S.Ct. at 1551, 113 L.Ed.2d at 697–699.

St.3d 58, 60, 554 N.E.2d 108, 110–111. In other words, the police must have an articulable and reasonable suspicion that the suspect is engaged in criminal activity.

 Limited investigative stops where the officer has a reasonable, articulable suspicion, but not probable cause, to believe that the suspect is engaged in criminal activity do not allow the officer to perform a "full search." *Royer*, 460 U.S. at 499, 103 S.Ct. at 1325, 75 L.Ed.2d at 237–238. The scope of the detention and of any questioning or search pursuant to the detention must be "carefully tailored." *Id.* at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238. Without a warrant, probable cause, and/or exigent circumstances, a search of a suspect's luggage (or jacket pockets) is not reasonable. *Id.* at 497, 103 S.Ct. at 1323–1324, 75 L.Ed.2d at 235–236. It can, however, be justified if the suspect voluntarily consents to the search, *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–2044, 36 L.Ed.2d 854, 858, within the scope of a lawful detention. *State v. Pinder* (Dec. 15, 1993), Miami App. No. 93 CA 6, unreported, 1993 WL 518692.

 Voluntariness is a question of fact and depends on the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–249, 93 S.Ct. at 2058–2059, 36 L.Ed.2d at 875. The government bears the burden of proving that the defendant's consent was "freely and voluntarily given." *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. The government has not met its burden when all it has proven is "mere submission to a claim of lawful authority." *Id.* If the defendant "consents" while being illegally detained, that consent is vitiated unless the government proves that it was not "the product of the illegal detention," but the "result of an independent act of free will." (Citations omitted.) *Id.* at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238.

 Deputy Newsome admitted on the stand that, in 1992 alone, he asked for consent to search incident to a traffic stop seven hundred eighty-six times. He then confidently proclaimed that "all" of the cars he stops for a traffic violation while he is involved in drug interdiction "will be searched * * * [m]ore so for any other reason the fact that I need the practice, to be quite honest." We think that this activity is the very essence of arbitrary and unjustified police conduct, and that such a widespread intrusion upon privacy rights caused by the officers engaged in such a practice is "too great for a democracy to sustain." See *Bostick v. State* (Fla.1989), 554 So.2d 1153. The very thought of American citizens, not suspected of any wrongdoing, being asked by the police to search their cars and luggage before exercising their right to drive the highways of this state is clearly repugnant to American institutions and ideals. See *State ex rel. Ekstrom v. Justice Court* (1983), 136 Ariz. 1, 6, 663 P.2d 992, 997 (Feldman, J., specially concurring).

Indeed, the eloquent words of Judge Andrews help to express our sentiment about this type of unjustified intrusion upon the privacy of the citizens of Ohio:

" ' * * * Despite the apparent protections of * * * [the] "right to privacy," the evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police, for identification, travel papers—in short a *raison d'etre*—is foreign to *any* fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, [or] Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward County, Florida, these police officers approach every person on board buses and trains ("that time permits") and check identification, tickets, ask to search luggage—all in the name of "voluntary cooperation" with law enforcement—to the shocking extent that just one officer, Damiano, admitted that during the previous nine months, he, himself, had searched *in excess* of three thousand bags! In the Court's opinion, the founders of the Republic would be thunderstruck. It certainly shocks the *Court's* conscience that the American public would be "asked", at badge-point, without the slightest suspicion, to interrupt their schedules, travels and individual liberties to permit such intrusions. This Court would ill expect *any* citizen to reject, or refuse, to cooperate when faced with the trappings of power like badges and identification cards. And these officers know that—that is one reason that they display those trappings. It is much like the feeling that an ordinary citizen has on seeing a patrol car behind him, or observing blue lights flashing, or being confronted by a police officer asking questions.' " (Emphasis *sic.*) *State v. Kerwick* (Fla.App.1987), 512 So.2d 347, 348–349 (quoting the Rulings of Law of Broward County Circuit Court Judge Robert L. Andrews).

The trial court found that Retherford was told that she could leave and therefore was not seized at the time Deputy Newsome asked for her consent to search her vehicle. The trial court determined that what did occur between Retherford and the deputies was a consensual encounter meeting all of the criteria for voluntariness prescribed under *Schneckloth, supra.* We conclude that the trial court erred in its assumption that a reasonable person in Retherford's place would have felt "free to leave" under the circumstances herein.

■■■■■ A police stop of a motor vehicle is a significant intrusion requiring justification as a "seizure" within the meaning of the Fourth Amendment and the Ohio Constitution. See *State v. Heinrichs* (1988), 46 Ohio App.3d 63, 65, 545 N.E.2d 1304, 1306, citing *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660, 667. In the case at bar, it is undisputed that the police stopped Retherford's vehicle as it was moving, and that the initial stop

of Retherford's vehicle was justified by the fact that Retherford was speeding. Therefore, Retherford was "seized" under both the Fourth Amendment and the Ohio Constitution the moment she was pulled over by Deputy Newsome.

In *Berkemer v. McCarty,* Justice Marshall explained why vehicle stops have been categorically recognized as a seizure of the person:

"It must be acknowledged at the outset that a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. *E.g.,* Ohio Rev.Code Ann. § 4511.02 (1982). Certainly few motorists would feel free to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." (Footnotes omitted.) (1984), 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317, 332

In *Delaware v. Prouse, supra,* the United States Supreme Court found that the intrusiveness of an automobile stop was substantial because pulling an automobile over to the side of the road may involve "an unsettling show of authority," interferes with freedom of movement, is inconvenient, takes up the individual's time, and "may create substantial anxiety." 440 U.S. at 657, 99 S.Ct. at 1398, 59 L.Ed.2d at 670.

We emphasize that this case is clearly distinguishable from those cases in which the encounter between the police and the individual is of a consensual nature. See *Bostick, supra; State v. Byrd* (1987), 32 Ohio St.3d 79, 512 N.E.2d 611 (driver of a van voluntarily stopped and approached the police). In *Bostick,* the United States Supreme Court held that not all encounters between the police and individuals are "seizures" of persons, provided the police do not convey a message that compliance with their request is required by means of physical force or show of authority. *Bostick,* 501 U.S. at 433–435, 111 S.Ct. at 2386, 115 L.Ed.2d at 398–399.

The record demonstrates that here, as in most traffic stops, the police significantly restricted Retherford's freedom of movement using "the panoply of authority that may be present when an automobile is pulled over." *United States v. Berry* (C.A.5, 1982), 670 F.2d 583, 593. Deputy Newsome turned on his lights and siren in his marked, official vehicle and forced Retherford over to the side of the road. Retherford stopped and was subsequently told by Deputy Newsome to get out of her vehicle. Soon after Retherford pulled over, another uniformed and armed deputy in a patrol car arrived on the scene. Retherford was questioned by Deputy Newsome about her travels as he issued her a warning citation. No one would seriously argue that Retherford felt free to terminate the encounter and walk away during this period just prior to her purported release.

We conclude that the mere fact that Deputy Newsome returned Retherford's license and told her she was free to go did not suddenly transform what was a non-consensual encounter which must be based at least upon reasonable suspicion into a "consensual" encounter in which an officer may "ask" a citizen, without the slightest articulable suspicion, to relinquish her individual liberties to permit a search of her car and luggage. See *State v. Kerwick, supra.*

When Deputy Newsome handed Retherford back her belongings and purported to release her to go on her way, a reasonable person, at that particular moment in time would certainly have felt free to walk away had the initial "seizure" in fact ended. What occurred after that point in time, however, clearly went well beyond a casual encounter with a law enforcement officer in a public place. Deputy Newsome's "freeing" of Retherford was merely a pre-arranged ploy to attempt to end the "seizure" so that the Deputy could interrogate Retherford and obtain her consent to search based on nothing more than the slightest "inchoate" and "unparticularized" hunch that she might be transporting contraband. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

We think that it strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel "free to leave" or "at liberty to ignore the police presence and go about his business," in spite of being told otherwise, when she is then asked investigatory questions by the officers and faced with a request to search her vehicle for contraband. We think that no reasonable person subjected to a traffic stop would feel free to walk away at any time when she is questioned about and confronted with the suspicion of drug trafficking. See *United States v. Berryman* (C.A.1, 1983), 717 F.2d 651. We agree that "statements by officers that individuals are suspected of smuggling drugs" are statements which "intimate that an investigation has focused on a specific individual [which] easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention." *United States v. Berry,* 670 F.2d at 597. Such a belief is only intensified by the inherently coercive nature of the atmosphere created by the initial traffic stop.

Thus, we conclude that the initial seizure of Retherford was not converted into a mere consensual encounter by her purported release because Deputy Newsome immediately focused a new investigation on Retherford not reasonably related to the purpose of the initial stop. Contra *State v. Clark* (July 26, 1991), Lucas App. No. L–90–315, unreported, 1991 WL 137012. Thus, the deputies' detention of Retherford began as a seizure and remained a seizure until she was actually allowed to proceed on her way. Because we have a seizure, as in all seizures, the government must demonstrate that any expansion of the scope of the initial detention was supported by independent reasonable or articulable suspicion that

**600**

the detainee is engaged in precisely the criminal activity that the officer seeks to investigate. See, e.g., *State v. Meyers* (1990), 63 Ohio App.3d 765, 580 N.E.2d 61.

 Once a police officer has made a legitimate and constitutional stop of a vehicle, the driver and the vehicle may be detained only for as long as the officer continues to have a reasonable suspicion that there has been a violation of the law. *Meyers,* 63 Ohio App.3d at 771, 580 N.E.2d at 64–65, citing *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237. If, for example, after inspecting the vehicle, issuing a citation or talking with the driver, the police officer is satisfied that there has been no further unlawful activity, "the driver must be permitted to continue on his or her way." *Meyers, op. cit.* In other words, an officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot. See *United States v. Brignoni–Ponce* (1975), 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580–2581, 45 L.Ed.2d 607, 616–617 (unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning *limited to the purpose of the stop* ). See, also, *Terry,* 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904 ("The scope of the [seizure] must be strictly tied to and justified by the circumstances which rendered its initiation permissible.").

As we have previously stated, "the mere fact that a police officer has an articulable and reasonable suspicion sufficient to stop a motor vehicle does not give that police officer 'open season' to investigate matters not reasonably within the scope of his suspicion." *Fairborn v. Orrick* (1988), 49 Ohio App.3d 94, 95, 550 N.E.2d 488, 490. See, also, *Chatton* and *Meyers, supra.*

In the present case, Deputy Newsome's questions about drugs, weapons and money were clearly not the stuff of casual conversation but were in the manner of an investigation, *i.e.,* an attempt to verify or dispel his inarticulate suspicions about Retherford. See, e.g., *Royer,* 460 U.S. at 502, 103 S.Ct. at 1326–1327, 75 L.Ed.2d at 239–240. Moreover, his request for consent to search for these items was merely an effort to confirm or deny his "hunch" that Retherford was carrying contraband. As we have already noted, this interaction went well beyond a casual encounter with a law enforcement officer in a public place and impermissibly broadened the scope of the traffic stop on less than reasonable suspicion.

We wish to emphasize that we are not saying that an officer cannot engage in casual conversation or ask a few general questions of a detainee or suggesting that consent can never be sought during a lawful detention without creating an illegal detention. What we are saying is that the casual conversation, the general questions, or the request for consent cannot be used to impermissibly broaden

the investigative scope of the initial detention in the absence of a reasonable or articulable suspicion that further criminal activity is afoot. In *Adams v. Williams* (1972), 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616–617, the United States Supreme Court noted as follows:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief [investigative] stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." See, also, *State v. Hart* (1988), 61 Ohio App.3d 37, 40–41, 572 N.E.2d 141, 144.

We stress, however, that such an investigation must be justified by some objective manifestation that the person stopped is, "or is about to be, engaged in criminal activity." *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628. As we stated in *Meyers*, "if circumstances attending an otherwise proper stop should give rise to a reasonable suspicion of some other illegal activity, different from the suspected illegal activity that triggered the stop, then the vehicle and the driver may be detained for as long as that new articulable and reasonable suspicion continues, even if the officer is satisfied that the suspicion that justified the stop initially has dissipated." *Id.*, 63 Ohio App.3d at 771, 580 N.E.2d at 65.

■ We must conclude in this case that Deputy Newsome lacked a reasonable, articulable suspicion to detain Retherford in order to inquire about or obtain consent to search for drugs, weapons, large sums of money or any other contraband. Deputy Newsome testified that there were several "indicators" which made him somewhat suspicious that Retherford may have been transporting contraband, but he implied that these "indicators" provided him with little more than a hunch that Retherford was involved in criminal activity.

As we noted, the only facts Deputy Newsome mentioned that made him the least suspicious of Retherford were the luggage in the back seat, her nervousness, and her travel from Cincinnati to Port Clinton. Any one of these factors, when considered alone, is not sufficient to support a finding of reasonable suspicion, since each is entirely consistent with innocent travel. However, the relevant inquiry is not whether the particular conduct is innocent or guilty, but rather the degree of suspicion that attaches to particular non-criminal acts. *United States v. Sokolow* (1989), 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1.

Retherford was travelling alone, so we think it would be not unnatural to place what little luggage she had into the back seat. Deputy Newsome admitted that Retherford was no more nervous than an average person stopped for a traffic violation. And there is no evidence that the route from Cincinnati to Port Clinton is a major drug corridor. As the United States Supreme Court stated in *Reid v. Georgia,* to hold that so little could justify a seizure would be to allow "virtually random seizures" of presumably innocent travellers. (1980), 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890, 894.[6] Thus, even when the factors are considered in toto, their probative force is insufficient to authorize a reasonable suspicion of wrongdoing. Instead, Deputy Newsome's belief that Retherford was transporting contraband was "more an 'inchoate and unparticularized suspicion or "hunch," ' than a fair inference in light of his experience." *Id.*

Since there were no articulable facts and no rational inferences to support the police activity involved in this case, the detention of Retherford was unlawful and unjustified. Having determined that the detention was unlawful, we must consider whether Retherford's "consent" to search her car and luggage overcame the taint of the illegal police conduct. We find that it does not.

When consent is obtained after illegal police activity, such as an illegal detention, search, or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search. The consent will be held voluntary only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238–239. "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal [seizure] include the length of time between the illegal seizure and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *United States v. Richardson* (C.A.6, 1991), 949 F.2d 851, 858. See, also, *Brown v. Illinois* (1975), 422 U.S. 590, 603–604, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416, 427–428; *State v. Pinder, supra.*

In the present case, the consent was obtained during the course of an illegal detention. There was no time lapse between the seizure and the request to search, nor was there any intervening circumstance that might have served to break or to weaken the connection between one and the other. The purpose of the continued detention was solely to illegally broaden the scope of the initial detention. We conclude that there was no single factor in this transaction that would serve to purge the illegal taint of the seizure.

---

6. In *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754, 65 L.Ed.2d at 894, the court held that innocent travelers cannot be subject to virtually random seizures merely because they fit an informal drug courier profile.

Consequently, we need not inquire into whether Retherford's consent was truly voluntarily given "in a spirit of apparent cooperation." (Citations omitted.) *United States v. French* (C.A.6, 1992), 974 F.2d 687, 694. We again hold, as we did in *Pinder, supra,* that a "valid consent cannot be given following an illegal detention to which it is strongly connected, and that evidence uncovered as a result of such a search must be suppressed as fruit of the poisonous tree." See, also, *State v. Heaven* (1990), 65 Ohio App.3d 832, 834–835, 585 N.E.2d 521, 523– 524.

The trial court in this case incorrectly focused on the voluntariness of Retherford's consent rather than on whether the connection between the unreasonable seizure and the request to search was sufficiently attenuated to purge the illegal taint. Since we find that the taint of the illegal seizure vitiated Retherford's consent, we conclude that the trial court erred in overruling her motion to suppress the evidence obtained during the illegal detention.

As we said in *State v. Foster* (1993), 87 Ohio App.3d 32, 42, 621 N.E.2d 843, 850, "we are extremely sympathetic and in complete support of the often heroic efforts by our law enforcement officials to stem and if possible turn back the tide of illicit drugs." Such an effort cannot be engaged in, however, at the expense of our precious constitutional liberties. As the United States Supreme Court noted in *Bostick, supra,* "[t]his Court is not empowered to suspend constitutional guarantees so that the government may more effectively wage a war on drugs. If that war is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of committing a crime." *Id.,* 501 U.S. at 439, 111 S.Ct. at 2389, 115 L.Ed.2d at 401. Moreover, we agree with the sentiment expressed by Judge Glickstein, who stated in dissent:

"Occasionally, the price we must pay to make innocent persons secure from unreasonable search and seizure of their persons or property is to let an offender go. Those who suffered harassment from King George III's forces would say that is not a great price to pay. So would residents of the numerous totalitarian and authoritarian states of our day." *Snider v. State* (Fla.App.1986), 501 So.2d 609, 610.

In light of the foregoing, we find that the trial court committed reversible error in failing to suppress the evidence seized from Retherford during the search of her vehicle and purse. Accordingly, the judgment of the Montgomery County Court of Common Pleas will be reversed and the case remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

F AIN and F REDERICK N. Y OUNG , JJ., concur.