Defendant-appellant Marty F. Hull appeals from his conviction and sentence, following a no-contest plea, for Petty Theft and for Attempted Possession of Criminal Tools. Hull contends that the trial court erred by denying his motion to dismiss on statutory Speedy Trial grounds, and by denying his motion to suppress evidence upon the grounds that it was obtained as the result of an unlawful search and seizure. We conclude that the trial court properly denied both motions. Accordingly, the judgment of the trial court is Affirmed.
 I
Hall first came to the attention of Sugarcreek Township police officer Vincent Chalecki on the evening of January 26, 1996, while Hall was parked in the parking lot of a Walmart store located on Wilmington Pike, in Sugarcreek Township. Chalecki had become suspicious of Hall as a result of his Hamilton County license plates, and the existence of a lot of merchandise, receipts, UPC tags, manufacturer's tags, and razor blades, as well as some super glue. Chalecki tapped on Hall's window and had a brief conversation with him, but did not detain him. Hall and his police officer trainee, Jim Deaton, went back to their cruiser and continued to observe. They saw Hall enter the Walmart.
Chalecki entered an adjacent store, and contacted the service desk at the Walmart. When asked why he did so, Chalecki testified as follows:
 Because of the way he was tampering with the receipts and the fact that he was from Cincinnati. And I couldn't justify why he'd possibly come all of the way to Sugarcreek to make a refund at a Walmart when there are a lot of other Walmarts. I become suspicious that maybe there was going to be a fraudulent refund done.
As a result of Chalecki's conversation with the Walmart service desk, he continued to be suspicious. By the time he returned to the cruiser, Deaton reported that Hall had already left the area. After a brief interval, however, they located Hall parked behind a Shell station. A short while later, Hall jumped in his car and headed northbound on Wilmington Pike. At this point, Chalecki and Deaton saw that Hall did not have an operational license plate light. They eventually got behind Hall on southbound I-675, and initiated a traffic stop.
Chalecki told Hall that he was stopped for not having an operational license plate light and for his exhaust being too loud. Chalecki asked Hall for his driver's license. Hall pulled one wallet out of his back pocket, which was empty except for a piece of paper that had some handwriting on it. Then Hall reached behind the passenger seat, pulled out a second wallet and produced a driver's license. This heightened Chalecki's suspicion, because, as he explained it:
 A lot of times cases where people go in to shoplift, males and females, they will either carry no ID or completely empty wallets or purses so if they are apprehended they don't have any identification on them. And a lot of times these factors indicate their identity and give false information.
Chalecki gave Deaton the driver's license and told him to take it back to the cruiser and run it to see if it was valid and if there were any outstanding warrants. While Deaton was doing so, Chalecki struck up a conversation with Hall that included the following:
 I just asked him, I said, I asked him if he remembered me and he really I don't think did and he really I don't think did from Walmart. I asked him where he was coming from. And he stated I was at Walmart and did a refund. I asked him, I said: "You say you live in Cincinnati." He said: "Yes." I asked him what he was doing up here. "Well, I was at my aunt's house in Springboro." And he said: "I was returning a piece of luggage that didn't match her set." And that was about it. I asked him, I said: "Why would you come up to Sugarcreek Township and return it when there is one on Springboro at the Dayton Mall and Hamilton, that area in Cincinnati where you live." "Only Walmart whose location I was sure of." I became suspicious with that. That is pretty much the context of what our conversation was at the time until Officer Deaton returned.
Chalecki had expected that Deaton would write up a citation, but Deaton did not. Deaton merely reported that there was no problem with Hall's license.
What happened next was described by Chalecki as follows:
 Officer Deaton returned. At that point, I asked Mr. Hull, I said: "You know, under the circumstances would you give me consent to search your vehicle. You don't have to if you don't want to, and you know, that is your right but, if you would allow me I'd like to search your vehicle." He said: "No problem."
Chalecki asked Hall to remain near the vehicle so that, if Hall would tell Chalecki to stop at any time, Chalecki could do so. The weather was "real windy and rainy and cold," and Hall eventually complained to Deaton that he was cold. At that point, Chalecki told Deaton to go ahead and take him back to the cruiser, where Deaton and Hall remained while Chalecki searched the vehicle.
Hall was arrested and charged with Grand Theft and Possession of Criminal Tools. He filed a motion to suppress evidence upon the grounds that it was obtained as a result of an unlawful search and seizure. The motion was heard, and was taken under advisement.
About six months later, the trial court overruled Hall's motion to suppress, and set the case for a jury trial. Thereafter, Hall moved to dismiss the charges upon the grounds that his statutory Speedy Trial rights had been violated. After this motion was overruled, evidently as a result of a plea bargain, Hall was allowed to plead no contest to one charge of Petty Theft and one charge of Attempted Possession of Criminal Tools. He was sentenced accordingly.
From his conviction and sentence, Hall appeals.
 II
Hall's First Assignment of Error is as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT DENIED APPELLANT HIS RIGHT TO A SPEEDY TRIAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND OF ORC SECTION 2945.71(C)(2).
Essentially, Hall contends that the trial court erred when it continued the trial date indefinitely for purposes of considering his suppression motion, and that, as a result of this indefinite continuance, his right to a speedy trial, under both the U.S. Constitution, and R.C. 2945.71, was violated.
The State concedes that 369 days elapsed from the date of Hall's arrest until he entered his plea of no contest and was found guilty. This is in excess of the 270-day period prescribed by R.C. 2945.71. However, 91 days of the 369-day period were tolled as a direct result of Hall's motions, including his motions for a continuance. This period of time ran from March 26, 1996, when Hall moved to suppress evidence, through June 25, 1996, a trial date established as a result of one of Hall's two motions for a continuance. On June 18, 1996, the trial court, sua sponte, continued the June 25, 1996, trial date for the purpose of allowing time to rule upon Hall's motion to suppress. This motion had come on for hearing on May 8, 1996, and a supplemental memorandum in support of Hall's motion to suppress had been filed as late as May 29, 1996. Thus, the trial court's sua sponte entry continuing the trial date was filed just 20 days after the filing of Hall's post-hearing memorandum in support of his memorandum to suppress. In our view, the trial court's sua sponte continuance entry was timely filed, and the delay caused by the continuance was occasioned as a result of Hall's motion to suppress, which is a ground for tolling the time within which the defendant must be brought to trial. R.C. 2945.72(E).
We conclude that the trial court's sua sponte continuance entry of June 18, 1996, satisfied the requirement "that any sua sponte continuance must be reasonable, and must be accompanied by a journal entry which is made prior to the expiration of the statutory time limit and explains the reasons for the continuance." State v. King (1994), 70 Ohio St.3d 158.
The question remains whether the amount of the delay actually occasioned as a result of a trial court's sua sponte, indefinite continuance of June 28, 1996, was reasonably necessary. In other words, did the trial court rule upon Hall's motion to suppress within a reasonable period of time?
The State points to C.P. Sup. R. 6, which directs a trial court to rule on a motion within 120 days from the date the motion is filed. The State recognizes that the Rules of Superintendence only establish a guideline, but argues that there is no reason shown in this case why the trial court should not have had at least 120 days as a reasonable period of time within which to consider Hall's motion to suppress. We agree with the State that no reason can be shown in this case why the trial court ought not to have had at least 120 days as a reasonable time within which to decide Hall's motion to suppress.
As the State points out, Hall's motion to suppress was filed March 26, 1996, and 120 days thereafter brings us to July 24, 1996. It should be remembered that Hall's motion was the subject of an evidentiary hearing, with at least one post-hearing memorandum. We agree with the State that it was not unreasonable for the trial court to take at least until July 24, 1996, by which to decide Hall's motion to suppress. Thus, the entire period of time from the filing of the motion to suppress on March 26, 1996, until July 24, 1996, is properly tolled pursuant to R.C.2945.72(E) and (H). With that tolling, the trial date of January 29, 1997, was within 249 days of the date of arrest, and Hall's statutory Speedy Trial rights were not violated.
We emphasize that in so concluding we are not determining that any part of the trial court's delay, after July 24, 1996, in ruling upon Hall's motion to suppress was unreasonable; we are merely agreeing with the State that the period from March 26, 1996, until July 24, 1996, at least, was a reasonable period of time within which to consider the motion to suppress.
Hall also argues that his constitutional right to a speedy trial, under the Sixth Amendment to the U.S. Constitution, was violated. Hall has cited no cases in support of this argument, and we conclude that he has shown no prejudice or oppressive conduct constituting a violation of his constitutional right to a speedy trial.
Hall's First Assignment of Error is overruled.
 III
Hall's Second Assignment of Error is as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE SINCE THE ARRESTING OFFICERS COMMITTED AN ILLEGAL SEARCH AND SEIZURE.
Although Hall argues that the stop for failing to have a operational license plate light was pretextual, he recognizes that this is no longer a viable argument in view of Whren v.United States (1996), 116 S.Ct. 1769. As the State notes, Dayton v.Erickson (1996), 76 Ohio St.3d 3, also stands for the proposition that an investigative stop is not unlawful if the police officer making the stop had authority to make it, even though the officer may have had some ulterior purpose in making the stop. In the case before us, Hall's license plate light was not working, and this justified the traffic stop. Hall contends, however, that because the consent to search his car was obtained after the legitimate period of detention for an investigative stop, the consent was obtained as a result of an unlawfully-prolonged stop, and is therefore vitiated, citing State v. Retherford (1994),93 Ohio App.3d 586.
In our view, there are two important distinctions in the case before us. The first is that the traffic stop was not yet completed. Chalecki had told Deaton to take Hall's driver's license back to the cruiser, and run it on the computer to see whether the license was valid, and whether there were any outstanding warrants. Although Hall evidently had expected Deaton, a trainee, also to write a citation, he did not testify that he told Deaton to do so, and Deaton did not do so. Deaton merely ran the the license, and returned to Hall's car with the report that the license was valid and there were no outstanding warrants. Thus, the citation remained to be written.
Furthermore, we have reviewed the complete transcript of the suppression hearing, and we find nothing therein to indicate that the investigative stop was unduly prolonged.
The second important distinction from Retherford, supra, is that Chalecki told Hall he didn't have to consent. The problem with which we were concerned in Retherford, supra, was the coercive implication that before the person being stopped for a traffic violation was truly free to leave, she must first have had to consent to a search of her car. In the case before us, by contrast, Chalecki expressly told Hall that he did not have to consent.
Based upon our review of the record, we are satisfied that there is evidence in the record from which the trial court could find, as it evidently did, that Hall's consent was not coerced, but was voluntary, and that it was not obtained during an unlawful prolongation of the period of detention resulting from the traffic stop.
Hall's Second Assignment of Error is overruled.
 IV
Both of Hall's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WOLFF, JJ., concur.
Copies mailed to:
William F. Schenck
Robert K. Hendrix
J. Allen Wilmes
Hon. Thomas Rose