OPINION
{¶ 1} The State of Ohio and the City of Dayton ("the State") appeal from an order of the Dayton Municipal Court suppressing a crack pipe and a small amount of marijuana. We reverse.
 {¶ 2} The State assigns the following error:
 {¶ 3} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION TO SUPPRESS EVIDENCE WHEN THE ENCOUNTER BETWEEN THE POLICE OFFICER AND DEFENDANT-APPELLEE WAS A CONSENSUAL ENCOUNTER AND RAISED NO FOURTH AMENDMENT ISSUE."
 {¶ 4} The facts at the suppression hearing were presented by a single witness, Dayton Police Officer Robert Rike.
 {¶ 5} He testified that he and a partner, dressed in police uniforms and in a marked cruiser, were patrolling the Desoto Bass public housing area about 10:30 p.m. on December 20, 2001. They noticed the defendant, Denise Allen, appear to attempt to avoid them as they patrolled the parking lot.
 {¶ 6} As to the encounter with Allen, Rike stated:
 {¶ 7} "Q. And what about the defendant's conduct raised your suspicion?
 {¶ 8} "A. Well, that area, that parking lot and that area specifically is a high drug area. We just recently made several drug arrests at 1751 Banker specifically. There are constantly drug users and drug sellers hanging out in that area. As I said, we make arrests almost on a nightly basis in that area for drug offenses.
 {¶ 9} "Q. What about, though, the specific conduct that you observed of the defendant raised your suspicion?
 {¶ 10} "A. Well the fact that she would avoid us. She was obviously avoiding us. She would — as I said, we would pull into an area; she would immediately change directions; walk the other way. This was on every occasion. She never once continued in a direction she was going when we were there.
 {¶ 11} "Q. Based on your observations, then what action did you take?
 {¶ 12} "A. As I said, after observing this for 20 to 30 minutes, I decided to go up an [sic] just conduct a simple field interview with her.
 {¶ 13} "Q. And can you describe what you did as you approached her?
 {¶ 14} "A. We pulled into the lot in the 1700 block of Banker. I got out of the cruiser. She had turned and walked away from us around the corner of the building out of sight.
 {¶ 15} "I walked up the sidewalk between the two buildings and around the corner of the building where she had now turned and was walking back to the corner where I was at.
 {¶ 16} "As she was coming towards me, I walked up and said how you doing? Do you live out here?
 {¶ 17} "Q. Did she respond to you?
 {¶ 18} "A. Yes. Her response was no, she was staying with someone in the area. As she spoke, I couldn't understand her. I was having trouble understanding what she was saying. And I noticed that her bottom lip on the left side was basically sticking straight out.
 {¶ 19} "At that point I just asked her if she had something in her mouth. She turned away from me and said no. And I said could you turn around here and talk to me please? And she turned back around. I said ma'am, do you have something in your mouth? It's common for drug users and sellers to attempt to conceal drugs and things of that nature in their mouth. At this point I believe that's what was going on.
 {¶ 20} "I just again, I said ma'am, do you have something in your mouth? And she said yeah, it's my stem. A stem is basically street name or language for a crack pipe.
 {¶ 21} "Q. And what happened at that point?
 {¶ 22} "A. I asked her to spit it out on the ground.
 {¶ 23} "Q. Did she do so?
 {¶ 24} "A. Yes.
 {¶ 25} "Q. You recovered that item then?
 {¶ 26} "A. Yes.
 {¶ 27} "Q. Was she placed under arrest?
 {¶ 28} "A. Yes, sir."
 {¶ 29} On cross-examination, Officer Rike stated that he exited the cruiser to field interrogate Allen after her second or third perceived attempt to avoid him and his partner. He testified that the actual encounter occurred after Allen walked toward him as he stood on a corner after he had exited the cruiser and followed her around that corner. Officer Rike stated that Allen was free to leave but did not do so.
 {¶ 30} After Officer Rike retrieved the crack pipe, Allen was arrested. During the trip to jail, the officers stopped the car due to Allen's unusual movements in the back seat and located a small quantity of marijuana where Allen had been sitting.
 {¶ 31} The controlling question in this case was whether the police interaction with Allen was a Terry stop, which required for justification a reasonable, articulable suspicion of criminal activity on Allen's part, or a consensual encounter, which required no justification.
 {¶ 32} The trial court analyzed the encounter as a Terry stop, and a deficient one at that, in ordering the evidence suppressed. The State did not argue consensual encounter either orally or in writing in the trial court.
 {¶ 33} In our judgment, the interaction was in the nature of a consensual encounter and the trial court erred in suppressing the evidence. See State v. Retherford (1994), 93 Ohio App.3d 586, 592 as to our duty to independently determine whether the facts support the trial court's conclusion.
 {¶ 34} It is clear that whether a police-citizen interaction is a consensual encounter or something more is to be determined from the totality of the circumstances. As stated in United States v. Mendenhall
(1980), 446 U.S. 554:
 {¶ 35} "We conclude that a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."
 {¶ 36} Applying these factors to the facts of this case, the interaction was between a single citizen and a single officer; the officer was armed but did not unholster his weapon; Officer Rike did not touch Allen; Officer Rike's request that Allen spit out the crack pipe did not imply that he would force her to do so.
 {¶ 37} Furthermore, the interaction occurred in a public area and the court has, since Mendenhall, minimized the coercive potential of a police officer's holstered weapon. U.S. v. Drayton (2002),122 S.Ct. 2105, 2112.
 {¶ 38} Although it is clear that Allen's initial conduct was consistent with wanting to avoid the officers, her eventual interaction with Officer Rike was not coerced, and the evidence does not suggest that Officer Rike's questioning of Allen was coercive.
 {¶ 39} We are satisfied that the entire interaction between Allen and Officer Rike — prior to the arrest — was a consensual encounter rather than a seizure. Nevertheless, if — as the State suggests — asking Allen to turn around and asking her again if she had had something in her mouth might have amounted to a seizure, we agree with the State that by then Officer Rike possessed a reasonable suspicion that Allen had contraband in her mouth.
 {¶ 40} The assignment of error is sustained.
 {¶ 41} The order of suppression will be reversed and the matter will be remanded to the trial court for further proceedings consistent with this opinion.
FAIN, J. and YOUNG, J., concur.