OPINION
{¶ 1} Defendant-appellant Philip Mimica appeals from a conviction and sentence, following a negotiated no-contest plea, to one count of Trafficking in Marijuana. Mimica contends that the trial court erred when it overruled his motion to suppress evidence, because the trial court erroneously found, implicitly, that the *Page 2 
University of Dayton police officers who entered his room had his consent to do so. We conclude that there is evidence in the record to support the trial court's finding. Consequently, the judgment of the trial court is Affirmed.
 I {¶ 2} The facts, as found by the trial court, are as follows:
 {¶ 3} "Late on the evening of October 29, 2007, uniformed University of Dayton police officers Dan Little and Tom Weber were checking an area behind a university building known to be frequented by drug users. They found several students smoking marijuana and one told them that `Phil' was dealing the drugs from his room at 636 Marycrest dormitory. The officers went to the room and knocked on the door and initially did not receive an answer. Officer Weber turned and started to walk away; the door was opened by Mr. Mimica where Officer Little remained.
 {¶ 4} "Officer Little said, `Hi, are you Phil?' to which the defendant responded, `Yes, why?' The officer then said, `We have a report from some students that you are supplying drugs out of your room;' according to Officer Little, Mr. Mimica then stepped back into his room and indicated with his right hand that the officers could enter. Officer Weber, who had taken several steps away from the door, did not hear the initial conversation, but did hear Officer Little say to Mr. Mimica, Thanks for inviting us in.'; he then walked in behind Officer Little.
 {¶ 5} "Once inside the room, the officers told the defendant that they had reports that he was dealing out of the room. The defendant then gave the officer a pill bottle *Page 3 
(which contained a minor misdemeanor amount of marijuana) from his pants pocket and reached over to his jacket and handed him a small metal box. Officer Little asked, `Is there anything else?' and the defendant asked, `Don't you need a warrant?' or `Where's the warrant?' The officer responded something to the effect of, `we do not need a warrant, this is not a search, we're just asking questions.'
 {¶ 6} "At that time, the defendant walked over to his foot locker and showed them some additional drugs, paraphernalia, and cash. The officers asked if the defendant would be willing to come to the university police headquarters to discuss matters further. The defendant was not handcuffed or under arrest. He was placed in an interview room that was videoed for the approximately two hours he was there.
 {¶ 7} "* * * *
 {¶ 8} "The defendant testified that he voluntarily opened the door, but never gave any hand gesture for the officers to enter; further, when he asked for a warrant, that the officers said they did not need one, but they could go and get one if he wanted and they would wait outside. Mr. Mimica did not feel the officers were `aggressive' at any time. There was apparently a roommate present but he did not testify."
 {¶ 9} There is evidence in the record to support these findings.
 {¶ 10} Mimica was charged by indictment with one count of Trafficking in Marijuana, in violation of R.C. 2925.03(A)(1), a felony of the fifth degree, and one count of Possession of Drug Paraphernalia, in violation of R.C. 2925.14(C)(1), a misdemeanor of the fourth degree.
 {¶ 11} Mimica moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, the trial court *Page 4 
overruled Mimica's motion to suppress. Thereafter, Mimica entered into a plea agreement, wherein he pled no contest to the count of Trafficking in Marijuana, and the count of Possession of Drug Paraphernalia was dismissed. The trial court accepted Mimica's plea, found him guilty of Trafficking in Marijuana, and sentenced him to community control sanctions.
 {¶ 12} From his conviction and sentence, Mimica appeals.
 II {¶ 13} Mimica's sole assignment of error is as follows:
 {¶ 14} "THE TRIAL COURT ERRED IN FAILING TO FIND THAT UNIVERSITY OF DAYTON POLICE OFFICERS LACKED CONSENT TO ENTER APPELLANT'S DORMITORY ROOM, AND THEREFORE VIOLATED ARTICLE I, SECTION 14 OF THE CONSTITUTION OF OHIO, AND THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 15} The evidence concerning whether the campus police officers had Mimica's consent to enter his room is conflicting. Although the trial court alluded to Mimica's testimony, the facts found by the trial court corresponded to the testimony of University of Dayton Police Officer Daniel J. Little, who testified as follows:
 {¶ 16} "Q. And what happened when you arrived at that room [the room from which marijuana had reportedly been sold]?
 {¶ 17} "A. We knocked and at first nobody answered. And we assumed that either the person wasn't home or it was bad information. So Officer Weber turned and began to walk away, and at that point the door was opened by Mr. Mimica. *Page 5 
 {¶ 18} "Q. Did you know at that moment that it was Mr. Mimica?
 {¶ 19} "A. No.
 {¶ 20} "Q. And what did you do when the door opened?
 {¶ 21} "A. I said, `Hi.' Because I was a bit surprised, after we had knocked and nobody answered, that he answered. And I said, `Are you Phil?'
 {¶ 22} "He said, `Yeah, why?'
 {¶ 23} "I said, `We have a report of students buying drugs from your room. Can we talk?'
 {¶ 24} "And he stepped back, waved his right hand in what I took to be an invitation into the room.
 {¶ 25} "Q. What did you do based on that?
 {¶ 26} "A. I walked into the room.
 {¶ 27} "Q. Did he make any type of protestation as to your entering the room?
 {¶ 28} "A. None.
 {¶ 29} "Q. Did he tell you that you were not welcome in the room?
 {¶ 30} "A. Never.
 {¶ 31} "Q. What did you do once you went inside?
 {¶ 32} "A. Officer Weber and I went in and asked him if he had any marijuana in the room, and he reached into his pants pocket and pulled out a pill bottle that had a little bit of marijuana in it. And then he reached into a jacket that was sitting on a chair nearby and pulled out a metal box, I guess you would call it, and handed it to us and looked at us, put his hands back in his pockets.
 {¶ 33} "And I said, `Are there any pipes, any scales, anything else?' *Page 6 
 {¶ 34} "And he asked, `What's the warrant?' [sic]
 {¶ 35} "I told him that There's no warrant. We're not searching anything. I'm asking, do you have anything. This is not a search of your — of your room.'
 {¶ 36} "And he walked over to the black box, flipped open the lid, and there sat pipes and the scales, and a couple bags of marijuana, and also a large roll of cash."
 {¶ 37} Little's cross-examination included the following exchange:
 {¶ 38} "Q. In your — you then stated in your police report that after you advised Mr. Mimica — or that you spent some time there at the door telling him why you were there. Correct?
 {¶ 39} "A. It was not a lot of time spent. I stated why we were there and asked if we could talk, and he motioned us in.
 {¶ 40} "Q. Tell me your exact words after he said `yes.'
 {¶ 41} "A. I told him that we had students state that he [sic] had purchased drugs from him. We talked.
 {¶ 42} "Q. Is it as Officer Weber claimed, that you were just walking right in the room after the door was open?
 {¶ 43} "A. I did not start walking until we were motioned in. I didn't even know that was Phil until I asked.
 {¶ 44} "Q. Now, you say that he was motioning you in. Is that correct?
 {¶ 45} "A. He motioned us in.
 {¶ 46} "Q. And you, I think, said there was some sort of hand gesture?
 {¶ 47} "A. It was a welcoming hand gesture.
 {¶ 48} "Q. You're waving your right hand to the right at about shoulder length. Is *Page 7 
that correct?
 {¶ 49} "A. That is correct."
 {¶ 50} Mimica testified at the suppression hearing. He denied having made any sort of gesture or other invitation to the officers to enter his room. Concerning whether they were acting in an "aggressive" manner, he testified as follows on cross-examination:
 {¶ 51} "Q. And were they [University of Dayton police officers Little and Weber] acting in an aggressive manner toward you?
 {¶ 52} "A. No. It was more just me cooperating and telling them what they wanted would be the best interest for the situation.
 {¶ 53} "Q. So —
 {¶ 54} "THE COURT: I'm sorry, sir, did you just think that, or did they say that?
 {¶ 55} "THE WITNESS: I was told that `you should tell us everything you know,' and along the lines of `it won't turn out as bad,' along those lines.
 {¶ 56} "THE COURT: And that was later in the police department, or that was in the dorm room they said that?
 {¶ 57} "THE WITNESS: That was in the police department.
 {¶ 58} "BY MR. SCOTT [representing the State]:
 {¶ 59} "Q. Were they acting any differently than [sic] in the police department than what they were in your dorm room?
 {¶ 60} "A. No."
 {¶ 61} Mimica's argument in support of his sole assignment of error is predicated exclusively upon the lack of evidentiary support for a finding that Officers Little and *Page 8 
Weber had Mimica's consent to enter his room. We conclude that there is support in the record for this finding. Little's testimony was that he asked Mimica if they could talk-hardly a command — and that in response, Mimica waved him in. The record reflects that at the hearing Little demonstrated the particular gesture that he construed as a nonverbal invitation to enter the room.
 {¶ 62} As the trial court noted in its written decision overruling the motion to suppress, Mimica offered conflicting testimony concerning the hand gesture. In its legal analysis, the trial court observed that: "The State has the burden to prove the consent to enter the room was `freely and voluntarily given' based on the totality of the circumstances.State v. Retherford (Montgomery, 1994), 93 Ohio App.3d 586, citingFlorida v. Royer (1983), 460 U.S. 491, at 497. Where, as here, the individual has not been illegally detained, `the State need not demonstrated [sic] that [the individual's] consent was an independent act of free will. Rather, the State must illustrate that the totality of the circumstances establish that [the individual] voluntarily consented to the search.' State v. Stephenson, Third Dist. No. 14-04-08,2004-Ohio-5102, ¶ 15, as cited in State v. O'Neal, Third Dist. App. No. 1-07-33, 2008-Ohio-512, ¶ 28; (or, in this case, that he voluntarily consented to the entry of the officers into his room)."
 {¶ 63} From the above-quoted analysis, it is clear that the trial court found that Mimica consented to Officers Little and Weber entering his room, and was concerned with whether that consent was voluntary, under all of the circumstances.
 {¶ 64} Of course, the trial court overruled Mimica's motion to suppress. We agree with the State that in the absence of anything in the record to support a contrary conclusion, the presumption of regularity requires us to presume that the trial court *Page 9 
resolved any conflicts in the testimony consistently with its ruling, so long as the testimony consistent with its ruling is inherently credible. We find Officer Little's testimony that Mimica gave his non-verbal consent to enter the room to be inherently credible.
 {¶ 65} Mimica's sole assignment of error is overruled.
 III {¶ 66} Mimica's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and GRADY, JJ., concur.
Copies mailed to:
Mathias H. Heck, Jr.
Michele D. Phipps
Anthony R. Cicero
Hon. Connie S. Price *Page 1