Donald G. Brown, Jr. is appealing the trial court's decision overruling his motion to suppress, the trial court's judgment convicting him for possession of drugs and possession of criminal tools, and the trial court's decision overruling his motion for a new trial.
On May 14, 1998, Brown was indicted on one count of possession of cocaine in an amount exceeding twenty-five grams but not exceeding one hundred grams and one count of possession of criminal tools. Brown filed a motion to suppress on June 2, 1998. Following a hearing, the trial court denied the motion[1].
A jury trial commenced on June 8, 1999, at which the State's evidence established the following. On May 6, 1998, at approximately 6:30 p.m., Dayton Police Officer Rick Elworth was on patrol driving southbound on Gettysburg Avenue when he observed a black Buick LaSabre, driven by Brown, headed northbound. Officer Elworth stated that he had heard loud music emanating from the car at a distance of approximately two hundred feet and that the music became louder as Brown approached him. Officer Elworth effectuated a traffic stop and proceeded to issue Brown a citation for loud music, in violation of Dayton Revised Code of General Ordinances § 94.12.
While checking his driver's license and license plate number, Officer Elworth discovered that Brown's driver's license had been suspended and that he had been driving without an operator's license. According to Officer Elworth, Brown, meanwhile, had exited his vehicle and had begun walking toward the cruiser. Officer Elworth exited the cruiser to inform Brown that his license was suspended and that he was going to be arrested. Officer Elworth performed a pat down search of Brown, discovering $1,439 in his pants pocket. Brown was placed in the cruiser and Officer Elworth proceeded to inventory the contents of the car prior to it being towed, according to departmental policy. Officer Elworth stated that there was a strong odor of marijuana coming from Brown's car, and Officer Elworth noticed an open container of beer on the floor of the front passenger seat. Officer Elworth stated that he had opened the rear passenger side door and had noticed a blue bank bag with an attached lock. Officer Elworth stated multiple times that the bank bag had been unzipped and open; however, at one point, he did state that he had unzipped the bank bag. According to Officer Elworth, he could see into the bank bag and recognized that it had contained four baggies of crack cocaine, later determined to be 37.58 grams of crack cocaine. The bag also contained a baggie with 4.47 grams of marijuana and a digital scale.Officer Elworth informed Brown that he was going to be placed under arrest for possession of crack cocaine, possession of criminal tools, driving without an operator's license, driving while under suspension, and the loud music violation. Officer Elworth read Brown his rights and asked Brown if he had a crack problem. Brown stated that he did not have a crack problem but had tried crack four or five times. Brown also stated, in the presence of Officer Elworth and Sergeants Spencer and Sewell, that he "transported drugs from point A to point B for people from time to time."
Brown testified on his own behalf. He stated that he was at work on May 6, 1998 when his wife Michelle called to ask for a ride to her cousin's home in Parkside apartments. When Brown arrived home to pick up Michelle, Steven Owensby, an acquaintance through Michelle's mother, was there wanting a ride. Brown claimed that Owensby had brought several trash bags with him which Brown had believed to contain clothing. Brown took Michelle and Owensby to Parkside, and returned to work.
Brown testified that after September of 1998, Owensby approached him to admit that the drugs found in the car were Owensby's. During this conversation, Brown and Owensby decided it would be "best" for Owensby to "come clean" and talk to Brown's attorney.
Brown denied that his music had been playing loudly when Officer Elworth stopped him. He explained that the $1,439 in his possession had been money from work he had completed for Main Automotive. He also denied telling Officer Elworth that he had transported drugs for money.
Steven Owensby testified on behalf of Brown. Owensby stated that he had two prior convictions for drug abuse, and he admitted to having used drugs in prison. Since his release from prison in 1996, however, he became involved in the "Big Papa" program to clear drugs out of the Desota Bass housing project. Owensby claimed that on May 6, 1998, he had been patrolling Desota Bass when he encountered two boys who were selling drugs from a trash can lid. According to Owensby, he had walked over and had picked up the drugs, along with two pistols, a clip and a digital scale, wrapping the items in a trash bag. He testified that he was not going to give the drugs to the police but to "Petey" who would remove them from the area. Owensby stated that he had walked around the housing complex with the drugs tucked under his arm. At approximately 4:15 p.m., he proceeded to Brown's house in hopes of acquiring a ride to Arlington Court apartments.
According to Owensby, Brown arrived home and drove him and Michelle to Parkside apartments. Owensby stated that during the ride a police cruiser had passed them. Owensby panicked, knowing that his story would be "unbelievable," and he pushed the drugs to the other side of the back seat. Owensby claimed that, when Brown dropped him off, he had accidentally left the bag of drugs in Brown's back seat but had remembered to take the pistols.
During cross-examination, Owensby admitted that he had a prior conviction for drug abuse, resulting from his eleventh hour confession in court after a third person had been charged with possession of his drugs.
The State produced several rebuttal witnesses. Notably, Edward Brown, a Dayton Metropolitan Housing Authority ("DMHA") Security Guard assigned specifically to Desota Bass, testified that he had never heard of the Big Papa program, and although he is familiar with most of the residents in the complex, he had never seen Owensby on his site. Edward Brown further stated that, if a person had been selling the amount of crack cocaine at issue in this case on a trash can in Desota Bass, and another person had walked by, taken the drugs, and walked away, that other person, in his experience and opinion, would "either be dead, or beaten unconscious, or beaten up." Similarly, Thomas Siafaera, Chief Security for DMHA, had never heard of the Big Papa program, and had never heard of Owensby.
Dayton Police Officer Michael August, who was assigned to the DMHA Task Force and had worked in Desota Bass for ten years, stated that he had never heard of the Big Papa program, Owensby, or a man named "Petey." Officer August testified that the usual drug sales in that area involved children, approximately 15 years of age, who had people watching them from different parts of the street and inside the apartment buildings. He stated that dealers usually only carry one to two grams of crack cocaine, and that he had never seen 37 grams of crack cocaine being sold at one time. Additionally, if a person were to try to take drugs from one of these dealers, especially in that amount, "someone [was] going to die."
On June 10, 1999, Brown was found guilty of possession of criminal tools and of drug possession. Brown filed a motion for acquittal or, in the alternative, for a new trial on June 29, 1999. The basis for this motion was that, during an informal discussion between the jurors, the attorneys, and the trial judge, one juror had stated that possession was "the deciding factor" in Brown's case. The juror allegedly stated, "We all thought he was definitely in possession although we didn't think he knew it was there." Following a remand and a stay of appeal from this Court, the trial court overruled this motion on June 8, 2000.
The termination entry was filed on July 6, 1999, whereby the trial court sentenced Brown to eight years incarceration on the drug possession charge and one year on the possession of criminal tools charge, to be served concurrently with each other.
Brown filed his notice of appeal on July 30, 1999, and now asserts three assignments of error.
 I.
The trial court erred in overruling Appellant's motion to suppress evidence seized from a container in Appellant's vehicle.
In his first assignment of error, Brown argues that the crack cocaine found in the bank bag should have been suppressed because it was seized without a warrant, was found absent a valid inventory search, and did not fall within the plain view exception to warrantless seizures. It is important to note that Brown does not contest the legality of the stop; he argues that the search of the "unzipped" bank bag and the seizure of its contents were not justified.
Preliminarily, we note that in reviewing a ruling on a motion to suppress, we must accept the findings of the trial court as long as they are supported by competent and credible evidence.State v. Retherford (1994), 93 Ohio App.3d 586, 592. We must, however, review the application of the law de novo. Id.
Furthermore, it is important to note that "[w]e must confine our review of the trial court's decision on the motion to suppress to the evidence before the trial court at that time." State v.Hunter (Oct. 8, 1999), Montgomery App. No. 17541, unreported.
Brown argues that Officer Elworth illegally seized the bank bag from the back seat of Brown's car, unzipped it, and discovered plastic baggies, and that Officer Elworth had been unable to determine what the baggies contained. At issue are the following findings of fact by the trial court:
 The defendant was placed under arrest for driving under suspension. The vehicle was going to be towed, thus an inventory was conducted at the scene by Officer Elworth.
In the rear of the vehicle, Officer Elworth observed a scrunched Best Buy bag and atop it an unzipped money bag. He could observe inside it, clear bags appearing to contain contraband, i.e. crack and marijuana. The bag was retrieved and was indeed found to contain cocaine, marijuana and drug paraphernalia.
The trial court concluded that Officer Elworth had made a legitimate traffic stop and that he had properly arrested Brown. The trial court further found that Officer Elworth had conducted a legitimate inventory search during which he had observed, in plain view, an open, unzipped bank bag containing what appeared to be crack cocaine. For those reasons, the trial court overruled Brown's motion to suppress.
We note that there was no testimony before the trial court during the motion to suppress hearing indicating that Officer Elworth had to "unzip" the bank bag. In fact, during the motion to suppress hearing, Officer Elworth consistently testified that the bank bag was already unzipped and that, based upon his experience, he had determined that the baggies contained crack cocaine. Although we agree that Officer Elworth, at one point during the jury trial, did testify that he had "unzipped" the bank bag, his testimony at the motion to suppress hearing never indicated such an act. Accordingly, we find Brown's recitation of the facts before the trial court at the suppression hearing to be inaccurate.
Additionally, we find no error in the trial court's determination that the inventory procedure itself was valid. One well-defined exception to the warrant requirement of theFourth Amendment to the United States Constitution is an inventory search of a lawfully impounded vehicle. Colorado v. Bertine (1987),479 U.S. 367, 371; South Dakota v. Opperman (1976), 428 U.S. 364, 367. The exception evolved from the three-fold purpose of protecting the owner's property while in police custody, protecting the police from claims over lost or stolen property, and protecting the police from potential danger. Opperman, supra, at 369. To be valid, the search must be conducted in accordance with standard police procedure and not as a subterfuge for an evidentiary search. Id. at 376. An inventory search's validity is dependent upon the legality of the impoundment. State v. Robinson (1979),58 Ohio St.2d 478, 12 Ohio Op.3d 394, and Opperman, supra. Additionally, if authorized by standardized police procedures, the routine impoundment is constitutional. Colorado v. Bertine,supra.
It is clear from the testimony at the suppression hearing that Officer Elworth effected a legitimate traffic stop, determined that Brown was driving while under suspension, and proceeded to arrest him. He properly proceeded to tow Brown's car, but not before complying with standardized policies of the Dayton Police Department, and conducting an inventory of the automobile. Officer Elworth explained the reasons behind inventorying a vehicle:
 Basically that is, from my understanding, for liability reasons and safety reasons to make sure that we're not sending a vehicle that's being towed with any kind of a loaded weapon in it or a body that might be in the trunk or contraband or also for his safety as far as valuables. I should say for liability, you know, some kind of radio or jewelry, whatever the value might be, so we can get it on the tow screen. If something would come up missing, Mr. Brown could take that up with the tow company.
(Motion to suppress Tr. 14.) Based upon this testimony, we find no error in the trial court's determination that the retrieval of the bag was valid as a legitimate inventory search.
Furthermore, we do not find error in the trial court's determination that because the bag's contents were in plain view, the seizure was lawful. This court has routinely applied the plain view exception to the general rule that a warrantless search is unlawful. State v. Pipkins (February 9, 1996), Montgomery App. No. CA 15060, unreported; State v. Ward (November 16, 1994), Montgomery App. No. CA 14186, unreported. Under the plain view doctrine, if a police officer is lawfully at a vantage point to see an object, and the object's incriminating character is immediately apparent, it may be seized without a warrant as long as the officers have a lawful right of access or control over the object. State v. Kinley (1995), 72 Ohio St.3d 491, 495; State v.Waddy (1992), 63 Ohio St.3d 424, 442. Furthermore, in order to satisfy the "immediately apparent" requirement, an officer must have probable cause to associate the object with criminal activity. State v. Halczyszak (1986), 25 Ohio St.3d 301, paragraph three of the syllabus.
Brown does not contest the legality of the stop, which satisfies the first issue of whether Officer Elworth was lawfully present when he seized the crack cocaine. The next issue for review is whether the criminal nature of the baggies full of crack cocaine was immediately apparent to Officer Elworth. Officer Elworth testified that when he proceeded to do the inventory of Brown's car, he leaned over the bank bag and saw several clear baggies of what appeared to be, based upon his experiences, suspected crack cocaine. Additionally, Officer Elworth had lawful access and control over the object, as the stop was legitimate and the inventory procedure was proper. We thus find that Officer Elworth seized the bank bag after its contents were in plain view, and such seizure was constitutional.
Based upon the preceding analysis, we conclude that the evidence obtained was not the result of an improper search and seizure. Brown's first assignment of error is overruled.
 II. The trial court erred in failing to grant Appellant's motion for judgment notwithstanding the verdict or for a new trial as the jurors indicated that they believed that Appellant did not know that the drugs were in his vehicle.
In his motion for a new trial, Brown alleged that during an informal discussion between the jurors, counsel and the trial judge, a juror had stated that he and other panel members believed that Brown had been in possession of the drugs, although they did not think that he had known that the drugs were in his car. Defense counsel, Barry Galen, attached an affidavit to the motion which stated:
 4. At the conclusion of the Jury Trial the State's Assistant Prosecuting Attorney, myself and the Court, the Honorable Barbara Gorman, were present to answer questions for the jury at the close of the proceedings. During this exchange the jurors were asked "What was the deciding factor, the focus of your discussions concerning your decision?" to which a juror responded "It was the possession and that was the deciding factor. We all thought he was definitely in possession although we didn't think he knew — it was there."
 5. Several of the jurors during this exchange indicated they did not see any definition for "knowingly" and one even argued that there was no definition for "knowingly" contained in the jury instructions.
 6. The Court acknowledged to the juror who questioned whether the definition was included in the instructions that indeed there was an instruction for the definition "knowingly".
 7. It was clear from the discussion with the jurors that they did not follow the Court's instruction and indeed render {sic} their verdict without finding that the Defendant "knowingly" possessed drugs.
The trial court overruled the motion, finding no conclusive evidence that the jury had failed to find an essential element of the possession of drugs charge. Additionally, the trial court noted that the State had proved the elements of the crime of possession beyond a reasonable doubt.
The trial court's analysis is as follows:
 In reviewing circumstances suggesting juror misconduct, a trial court must employ a two-tier analysis: (1) determine whether there was juror misconduct and (2) if juror misconduct is found, determine whether it materially affected the defendant's substantial rights. State v. Hopfer (1996), 112 Ohio App.3d 521, 543. As the law presumes proper conduct on the part of jurors, a defendant must set out a prima facie case of jury misconduct before there will be any presumption of prejudice. See State v. Schiebel (1990), 55 Ohio St.3d 71; Lund v. Kline (1938), 133 Ohio St. 317. Jury misconduct must be affirmatively proved. Lund, supra. More specifically, a presumption exists that the jury has followed the instructions given to it by the trial court. State v. Murphy (1992), 65 Ohio St.3d 554, 584, citing State v. Fox (1938), 133 Ohio St. 154 and Browning v. State (1929), 120 Ohio St. 62. That presumption will be indulged absent evidence to the contrary. State v. Brewer (Feb. 23, 1996), Montgomery App. No. 15166, unreported.
There is a further limitation in that certain types of evidence [are] not be used by a defendant to support a motion for a new trial by impeaching a jury verdict. The "aliunde" rule, embodied in Evidence Rule 606(B), provides as follows:
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.
 Juror testimony to impeach the verdict will be permitted only upon establishing a foundation of extraneous, independent evidence. "This foundation must consist of information from sources other than the jurors themselves, and the information must be from a source which possesses firsthand knowledge of the improper conduct." State v. Schiebel (1990), 55 Ohio St.3d 71, 75-76, citing Wicker v. Cleveland (1948), 150 Ohio St. 434. Likewise, an attorney's affidavit, such as that presented here, which attributes statements to jurors is also incompetent testimony. See Tasin v. SIFCO Industries, Inc. (1990), 50 Ohio St.3d 102 (where an attorney is told by a juror about another juror's possible misconduct, the attorney's testimony is incompetent and may not be received for the purposes of impeaching the verdict or for laying a foundation of evidence aliunde). Mr. Galen's affidavit does not present any evidence of improper influence or the consideration of extraneous prejudicial evidence. It seeks only to introduce juror statements which go solely to the deliberative process they employed and these are precisely the matters which the aliunde rule prohibits.
Under Crim.R. 33(A)(2), a new trial may be granted upon a defendant's motion if his substantial rights were materially affected by misconduct of the jury. We will not disturb the trial court's decision on this motion absent an abuse of discretion. Schiebel, supra, at 76.
In reviewing the trial court's determination denying the motion for new trial, we may not disturb its ruling on appeal without a showing of an abuse of discretion. Schiebel, supra, at paragraph one of the syllabus; Toledo v. Easterling (1985),26 Ohio App.3d 59. An abuse of discretion indicates that the decision was unreasonable, arbitrary, or unconscionable. State v.Adams (1980), 62 Ohio St.2d 151, 157, 16 Ohio Op.3d 169, 173.
We find that the trial court did not abuse its discretion in its determination that Brown provided insufficient evidence to support his claim of juror misconduct, and that the verdict should be impeached. We agree with the trial court that without evidence aliunde, there was not sufficient independent evidence of juror misconduct. Accordingly, we find no error in the trial court's decision and we hereby overrule Brown's second assignment of error.
 III. Appellant's conviction for possession of crack cocaine was not supported by sufficient reliable probative evidence and was against the manifest weight of the evidence.
In his last assignment of error it is unclear whether Brown is arguing a manifest weight of the evidence challenge or a sufficiency of the evidence challenge. We do not agree with the State that Brown is precluded from arguing a sufficiency of the evidence argument at this time, because he failed to make a Crim.R. 29(A) motion for judgment of acquittal. The case the State cites for that proposition, State v. Roe (1989), 41 Ohio St.3d 18, is a death penalty appeal, with thirty-nine propositions of law, that the Ohio Supreme Court was constitutionally mandated to consider. Many of the propositions of law received short shrift, which is not uncommon with death penalty cases reviewed by the Ohio Supreme Court. Although the Court noted, briefly, that "appellant failed to timely file a Crim.R. 29 motion for acquittal on these counts at trial and thus failed to preserve his arguments on appeal," the Court proceeded to review the evidence and concluded that there was evidence to support a finding that all essential elements had been proved beyond a reasonable doubt. Id., at 25.
Whether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic. If there is a failure of proof on any element of the offense, the defendant is entitled to a judgment of acquittal as a matter of law. Necessarily, then, the outcome would be different if the error — conviction on insufficient evidence — had not occurred.
In this case, however, we are satisfied that there is evidence in the record, that, if believed, is sufficient to establish all of the elements of the offense to which Brown was convicted, for all of the reasons set forth in the following section of this court's opinion dealing with Brown's claim that his conviction is against the manifest weight of the evidence.We will now address Brown's contention that his conviction was against the manifest weight of the evidence. In weight of the evidence challenges, an appellate court:
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. While Thompkins
explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of this portion of Brown's assignment of error.
Brown was convicted of one count of possession of cocaine in violation of R.C. 2925.11(A) and one count of possession of criminal tools in violation of R.C. 2923.24(A). R.C. 2925.11(A) states, "No person shall knowingly obtain, possess, or use a controlled substance." R.C. 2923.24(A) states, "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." Brown's argument focuses on the issue of whether the State adequately proved that Brown "knowingly" possessed the crack cocaine found in his vehicle. The basis for this argument is Brown's testimony that he was unaware of the drugs in his back seat, and that Owensby admitted responsibility for the possession of the drugs at trial.
The definition of "knowingly" is found in R.C. 2901.22(B), which states,
 A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
R.C. 2925.01(K) defines "possession" as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." Furthermore, possession may be actual or constructive, and it need not be physical possession. State v. Kobi (1997), 122 Ohio App.3d 160. To be in constructive possession, the evidence must demonstrate that Brown was able to exercise dominion or control over the crack cocaine. "[R]eadily useable drugs found in very close proximity to a defendant may constitute circumstantial evidence and support a conclusion that the defendant had constructive possession of such drugs." Id., at 174, citingState v. Pruitt (1984), 18 Ohio App.3d 50. See, also, State v.Barr (1993), 86 Ohio App.3d 227; State v. Paul (Feb. 4, 2000), Montgomery App. No. 17662, unreported.
Furthermore, as we stated in State v. Taylor (April 16, 1999), Montgomery App. No. 17142, unreported,
 We have recognized that circumstantial evidence and direct evidence inherently possess the same probative value. State v. Redman (June 12, 1998), Clark App. No. 97 CA 81, unreported. " * * * [T]he validity of the verdict depends more upon the quality than the type of the evidence, and the overriding question in such cases is whether all of the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." Id.
In this case, we find that credible, circumstantial evidence was present in this case to support the State's theory that Brown "knowingly" possessed the crack cocaine beyond a reasonable doubt. Brown was the sole occupant of his car at the time of the traffic stop, however he denied ownership and knowledge of the 37.58 grams of crack cocaine and 4.47 grams of marijuana which Officer Elworth had discovered in the back seat of his car. Brown claimed that earlier that day, he had given Owensby a ride to Parkside apartments. Brown stated that Owensby had had several "trash" bags with him, but Brown just thought they had contained clothes. According to Brown, it was Owensby's bags that contained the crack cocaine, thus Brown did not "knowingly possess" the crack.
Owensby claimed ownership for the bag of crack found in Brown's back seat. He explained to the jury that he had been involved in the "Big Papa" program in the Desota Bass housing project to clean up the streets. According to Owensby, on May 6, he was in Desota Bass when he noticed two boys selling drugs from a bag on top of a trash can. Along with the drugs was a digital scale and a crown royal bag containing pistols and bullets. Owensby claims he snatched the items from the two boys in an effort to clean up the area. Thereafter, he proceeded to Brown's home with the drugs, the digital scale, and the pistols in search of a ride to Arlington Court apartments. In Brown's car, Owensby panicked when he had seen a cruiser drive near them, knowing that his story would seem too "unbelievable." He claimed he moved the drugs to the other side of Brown's back seat and took the pistols.
On cross-examination, Owensby stated that he had known the owner of the drugs, but he could not remember his name. Owensby stated that the owner had also known Owensby had the crack cocaine, worth approximately $3,000, however this man had not come searching for Owensby or the drugs. Additionally, Owensby explained how he had never turned the drugs in to the police, but instead would give the drugs back to the dealers, and simply ask the dealers to sell in a different location. According to Owensby, this approach enabled him to gain the trust of the children from whom he would take the drugs.
On rebuttal, Edward Brown and Thomas Siafaera, DMHA Security Guards, testified that they had never heard of the Big Papa program, and they had never seen Owensby on DMHA grounds. Similarly, Officer August, who was assigned to the DMHA Task Force and who dealt with all crimes and complaints that occurred on DMHA properties, stated that he had worked at least part time with DMHA for at least ten years. During that time, he had never heard of the Big Papa program, had never heard of Owensby, and had recently asked a group of fifty residents, and they were all unfamiliar with the program.
Furthermore, Officer Jerome Harding testified that in June of 1992, Owensby had come to the police station to confess to a detective, claiming ownership in crack cocaine found in another man's pocket. This man had been charged three months earlier with possession, and was released upon Owensby's confession. Other testimony was presented that Owensby had been convicted of other drug and weapons offenses.
To further impeach Brown's credibility, Officer Michael Lally of the "K9" drug unit testified in response to Brown's denial that he did not smoke marijuana, and that no one had smoked marijuana in his car. Officer Lally inspected Brown's car prior to towing it. The drug dog alerted to traces of drugs throughout the car, and in fact, Officer Lally had found small marijuana roach butts and residue throughout the interior of the car.
As a final point, there was direct evidence that Brown exercised dominion and control over the crack cocaine found in his back seat. Officer Elworth testified that Brown had stated that he did not own the crack in his car, but he "merely transport[ed] the dope from point to point for different people, to transport it for money." Sergeant Spencer testified that he also had heard Brown's admission, but he could not recall if Brown had stated he would get money or crack for transporting the drugs. Similarly, Sergeant Sewell also heard Brown's statement, but recalled hearing Brown state he "transported people with drugs from place to place and doesn't transport drugs from place to place."
Based upon the above discussion, we find that some direct evidence and a great deal of circumstantial evidence exist to support the State's theory that Brown had knowingly possessed the crack cocaine, as he was either a runner or a transporter for a dealer. The verdict reflects the jury's decision finding credibility in the State's theory and witnesses. As we stated inLawson, supra, the jury's decision to find the State's witnesses more credible than Brown's and Owensby's testimony was within the competence of the jury because they had seen and heard the witnesses, and their determination is entitled to substantial deference by this court. See, also, State v. Sherrill (Jan. 28, 2000), Montgomery App. No. 17359, unreported.
We find that there is competent and credible evidence supporting the verdicts, and that the jury did not lose its way. Accordingly, Brown's third assignment of error is overruled.
 ___________________________ FREDERICK N. YOUNG, J.
BROGAN, J. and FAIN, J., concurs.
[1] The trial court's findings of fact and conclusions of law from the motion to suppress hearing are at issue in Brown's first assignment of error. For ease of organization, we will discuss the trial court's findings of facts and conclusions of law in that assignment of error.