The STATE of Ohio, Appellee,

v.

MAYS, Appellant.

[Cite as *State v. Mays,* 161 Ohio App.3d 175, 2005-Ohio-2609.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 84234.

Decided May 26, 2005.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Brian S. Deckert and Michael D. Horn, Assistant Prosecuting Attorneys, for appellee.

Carolyn Kaye Ranke, for appellant.

KARPINSKI, Judge.

{¶ 1} Defendant, Daniela Mays, appeals her jury trial conviction and sentence for murder and felonious assault. In light of the multiple errors that occurred in this case, we vacate the conviction and remand the cause for a new trial.

{¶ 2} Defendant is a 36–year–old mother of three, and the victim was her 75–year–old fiancé. The victim's wife had been in a nursing home with Alzheimer's disease for 14 years. Although he had stepchildren, he had never had any

children of his own. He was quite fond of defendant's children and told her he wanted to marry her so he could give her children his name and his benefits from his retirement from General Motors.

{¶ 3} The victim also provided defendant with a large portion of her financial support. Not working, she relied on food stamps. For one of her children, she received child support; the fathers of her other two children did not pay any support.

{¶ 4} Defendant's mother owned the home that defendant and her children lived in, and defendant paid her mother rent, which the victim often provided. Because defendant was in such dire financial straits, her mother had applied to the county for legal custody of the children so she could provide them with her health-care benefits. This application for custody caused friction between defendant and her mother. Defendant had been convicted of domestic violence against her mother—reportedly, her response to her mother's petition for custody of defendant's children. Defendant and her mother still remained close, however, and the mother often cared for defendant's children.

{¶ 5} On November 12, 2002, the victim was visiting defendant at her home in Parma, Ohio. Defendant called 911 because she said the victim was becoming belligerent and acting strange. She told the paramedics that he was diabetic and that she feared his blood sugar was at a dangerous level. After determining that the victim's blood sugar was within normal limits and that he had no other acute medical problems requiring their attention, the paramedics began to leave. They had not yet left defendant's driveway, however, when she called 911 again. This time, the paramedics requested police assistance. With the police accompanying them, the paramedics again entered the home. Describing the situation as "mutually combative," the police noted that the victim was accusing defendant of hiding his glucometer,[1] and she was accusing the victim of hiding her digital camera. The police offered to ask the victim to leave, but defendant stated that she did not want that. They then warned defendant not to call 911 again.

{¶ 6} The dispute apparently continued and became violent. Defendant claimed that the victim, in his attempts to hit her with the camera, had swung it around by its strap and had hit himself with it. She also claimed that he assaulted her and caused bruises on her arms, and she admitted to fighting back in self-defense.

{¶ 7} At some point, the victim left defendant's house and returned to his own home nearby. Defendant and her mother testified that he had left at 11:00 p.m., defendant having called her mother at 11:05 p.m. to tell her so.

---

1. A device to measure blood sugar.

{¶ 8} At around 5:30 in the morning the next day, the victim called 911 to his own home. He complained that he felt drunk, although he had not consumed any alcohol. The paramedics convinced him to allow them to take him to the hospital, where his condition rapidly deteriorated. By 10:30 a.m., he was unconscious and in severe metabolic acidosis. The doctors could not determine the cause of his acidosis and the subsequent acidotic encephalopathy causing his loss of consciousness. The doctors put him on dialysis because they suspected he had ingested a toxic substance, but they were at a loss to determine what that substance was.

{¶ 9} Defendant made several visits to the hospital that morning. At one visit, she presented the hospital with a durable power of attorney for health care for the victim, naming her as the attorney. This document, however, was not properly executed, and the hospital decided it was not enforceable. They then found an earlier, properly executed durable power of attorney for health care naming the victim's stepgrandson as his attorney.[2]

{¶ 10} Because the victim's condition was rapidly deteriorating, a police officer at the hospital requested officers to visit defendant's home to ascertain what had occurred the previous night. When these officers arrived, defendant invited them in and showed them the blood splattered around the house. She also showed them purported bruises on her arms. Although the officers testified that they had not seen any bruising, they had seen a few scratches.

{¶ 11} The officers decided that further investigation was in order and requested a detective who could decide what evidence was needed. At this time, defendant was still talking to the officers and had not been taken into custody.

{¶ 12} The nearest detective answered the call. After he entered the house, another officer showed him the blood in the various rooms while defendant talked with another officer. As he was looking around the house, the detective noticed the computer screen, which read, "[H]e will die today."

{¶ 13} The officers took defendant into custody and arranged for her mother to care for defendant's son when he arrived home from school. Defendant was then taken to the police station.

{¶ 14} After defendant had been taken out of the house, a second detective arrived with a camera, and the first detective took a picture of the screen. The detectives decided to take the computer as evidence. The first detective's usual assignment was computer crimes, so he was able to preserve the instant-message conversation that was on the computer.[3] After the detective saved the instant-

---

**2.** Another enforceable power of attorney naming defendant as attorney, dated after the stepgrandson's, was found after the victim died.

**3.** Instant messages are real-time communications that are not saved once the computer is shut down.

message conversation to the hard drive, he shut down the computer, and it was taken to the police department. The secret service later analyzed the contents of the computer for evidence.

{¶ 15} Despite the hospital's efforts, the victim died the next day, November 14, 2002. In the initial autopsy, Dr. Balraj determined that the cause of death was homicide from the assault against the victim. She noted that he had heart disease and diabetes and ruled that the beating had exacerbated these conditions and caused the victim's death. Upon a more detailed autopsy, an assistant pathologist noticed fan-shaped crystals in the victim's kidneys, and she requested a toxicology screen for ethylene glycol, a toxic ingredient of antifreeze, brake fluids, and other automotive fluids. This screen came back showing lethal levels of ethylene glycol in the victim's blood.

{¶ 16} Defendant received a jury trial and was acquitted on two counts and convicted on two counts. She was acquitted on count one (aggravated murder), which stated that defendant "purposely and with prior calculation and design, caused the death of another, to-wit: John McEwen." Count two (murder), on which she was convicted, stated that defendant "did cause the death of John McEwen, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, in violation of Section 2903.02 of the Revised Code."

{¶ 17} Count three (murder), of which she was acquitted,[4] repeated count two verbatim. Count four (felonious assault) stated that defendant "knowingly did cause or attempt to cause physical harm to John McEwen by means of a deadly weapon or dangerous ordnance, to-wit: camera, as defined in Section 2923.11 of the Revised Code."

{¶ 18} Defendant appealed, raising six assignments of error. Although we vacate the conviction on other grounds, the first assignment of error affects the retrial, so we will address it. It states:

> The trial court erred in overruling defendant's motion to suppress the evidence seized from her home on November 13, 2002.

{¶ 19} Prior to trial, defendant moved for suppression of the evidence found on her computer, claiming that "[n]o additional evidence of wrongdoing or emergency circumstance necessitated the warrantless entrance into Defendant's home or her arrest." She also argues that because the police did not have a search warrant, the detectives had no probable cause or legitimate basis for seizing the computer.

---

4. The state appears to have pursued two separate theories of murder: assault with a camera and poisoning with antifreeze. Neither the indictment nor the bill of particulars, however, specifies a cause of death.

{¶ 20} A citizen's right to be free from unreasonable search and seizure is found in the Fourth Amendment to the United States Constitution. This right is stronger in one's own home than it is in a public place. *Payton v. New York* (1980), 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639. The government may not, therefore, conduct a search or seize property inside a person's home unless one of several exigent circumstances exists. Id. at 587, 100 S.Ct. 1371, 63 L.Ed.2d 639. The government bears the burden of proving an exception to the warrant requirement. *N. Royalton v. Bramante* (April 29, 1999), Cuyahoga App. No. 74019, 1999 WL 258188.

Where there is no search warrant, the burden falls on the state to show that a search comes within one of the judicially recognized exceptions:

(a) A search incident to a lawful arrest;

(b) consent signifying waiver of constitutional rights;

(c) the stop-and-frisk doctrine;

(d) hot pursuit;

(e) probable cause to search, and the presence of exigent circumstances; or

(f) the plain-view doctrine.

*State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 51, 19 OBR 42, 482 N.E.2d 606.

{¶ 21} When an appellate court reviews a trial court's ruling on a motion to suppress, the reviewing court will accept the findings of the trial court if there is competent, credible evidence to support them. *N. Royalton v. Bramante*, Cuyahoga App. No. 74019, citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498.

{¶ 22} In the case at bar, the seizure of the computer falls within the plain-view exception to the rule. Under the plain-view exception, before evidence obtained in a warrantless seizure can be admissible, three requirements must be satisfied: the officer's intrusion into the home or location where the evidence is located must be lawful, the discovery of the evidence must be inadvertent, and the incriminating nature of the evidence must be immediately apparent. *Texas v. Brown* (1983), 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502, citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

{¶ 23} It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view,

but its incriminating character must also be "immediately apparent." *Horton v. California* (1990), 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112.

{¶ 24} Although defendant argues that she did not invite the police into the house, all the officers testified that she did invite them in and did not object to their continued presence in the home. The first requirement, that the officer be legally in a position to see the evidence, therefore, is satisfied. The second requirement, that the discovery be inadvertent, is also satisfied. The officers were in the home to see the signs of the struggle of the previous evening and to determine what may have happened to cause the victim to be near death. They had no expectation that a computer would be in the home or that the computer would contain incriminating evidence.[5] Finally, the message on the computer was clearly evidence of criminal activity. The victim was near death. He had told the police that defendant had beaten him. Defendant's computer screen read, "[H]e will die today." When police are investigating a suspected attempted murder, evidence of the suspected assailant's foreknowledge of the victim's death certainly qualifies as evidence of criminal activity.

{¶ 25} Nonetheless, defendant argues that the police could and should have waited to take the computer until they had obtained a warrant. The United States Supreme Court has held, however, that "requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a 'needless inconvenience.'" *Texas v. Brown* (1983), 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502, citing *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 468, 91 S.Ct. 2022, 29 L.Ed.2d 564. Further, the police did obtain a warrant before they searched the contents of the computer.

{¶ 26} The trial court did not err in denying defendant's motion to suppress the contents of the computer. The discovery of the computer fell under the plain-view exception to the Fourth Amendment warrant requirement. Accordingly, this assignment of error is overruled.

{¶ 27} Although the suppression hearing was properly conducted, the remainder of the trial presents a troubling dilemma. The trial court gave an

---

5. Although the police were legally inside the home, they were restricted in the extent of the search they could execute. "A suspect may of course delimit as he chooses the scope of the search to which he consents." *Florida v. Jimeno* (1991), 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297. Even if the police were legally in her home, defendant argues, they still exceeded the scope of her permission by studying the computer screen, which was not located near any of the blood that she showed them. A drawing of the layout of the house, however, shows that the computer was located in the great room and was in plain view of the police who were in that room.

erroneous instruction [6] for aggravated assault, and this error invalidates both convictions. Initially, the court instructed the jury correctly on aggravated assault, saying:

If you find the government proved beyond a reasonable doubt each and every essential element of felonious assault as charged in the indictment, and you also find that the defendant did prove sudden passion or sudden fit of rage and provocation by a preponderance of the evidence, and you also find that the defendant did not prove her claim of self-defense by a preponderance of the evidence, then you must find the defendant not guilty of felonious assault but guilty of the lesser offense of aggravated assault.

{¶ 28} The jury subsequently returned its verdicts, which the court read out loud:

Count two, murder, verdict, we, the jury * * * do find the defendant * * * guilty of murder in violation of Ohio Revised Code Section 2903.02 as charged in count two of the indictment.

Count four felonious assault, verdict, we, the jury * * * do find the defendant * * * guilty of felonious assault in violation of Ohio Revised Code Section 2903.11 as charged in count four of the indictment.

THE COURT: May I see counsel at the side-bar, please?

(Thereupon, a discussion was held between court and counsel outside the presence of the jury and off the record.)

THE COURT: [Mr. Jury Foreman], the Court instructed you with reference to the charge of felonious assault and a *lesser included offense* of aggravated assault, [sic] if you find on the felonious assault, then you can't find on the aggravated assault. If you fail to find the elements were satisfied for felonious assault, then you were to consider the elements of the *lesser included offense* which would have been aggravated assault.

So at this time, I must send these two forms back with you for you to make your decision.

(Emphasis added.)

{¶ 29} The court's instruction was erroneous. Aggravated assault is not a lesser included offense of felonious assault. Rather, it is an inferior degree of felonious assault. As the Ohio Supreme Court explained, inferior degrees of an offense differ from lesser included offenses. They are, the court said, "separate and distinct from the group of lesser 'included' offenses also provided for in the

---

**6.** The court also erred in instructing the jury on attempted murder. Attempted murder was not one of the counts in the indictment, and was not one of the options provided to the jury on their verdict forms. Instructing the jury on a crime which was not charged can serve only to confuse and distract the jury.

statute and rule." *State v. Deem* (1988), 40 Ohio St.3d 205, 208, 533 N.E.2d 294. Addressing the difference between various inferior offenses and lesser included offenses, the *Deem* court held: "Neither is aggravated assault * * * a lesser included offense of. felonious assault." Id. at 210, 533 N.E.2d 294. The court then explained:

> [A]lthough aggravated assault carries a lesser penalty than felonious assault (either a third or fourth degree felony), felonious assault, as statutorily defined, can be committed without an aggravated assault also being committed, since the provocation element is lacking in felonious assault. In addition, * * * all the elements required to prove the greater offense (felonious assault) are required to prove the commission of the lesser offense.

Id. at 210, 533 N.E.2d 294.

{¶ 30} The *Deem* court concluded, "[T]he offense of aggravated assault is an inferior degree of the indicted offense—felonious assault—since its elements are identical to those of felonious assault, except for the additional mitigating element of serious provocation." Id. at 210–211, 533 N.E.2d 294. In the case at bar, therefore, the court erroneously told the jury that aggravated assault was a lesser included offense of felonious assault.

██ {¶ 31} More serious is the court's statement that if the jury found all the elements of felonious assault, it *could not* find aggravated assault. This statement is clearly contrary to law. Again, although neither defense counsel nor the state objected to this instruction, it constitutes plain error. But for this error, defendant may have been convicted of aggravated assault rather than felonious assault.

{¶ 32} This error affects the validity of the murder conviction; to qualify as murder, rather than manslaughter, the cause of death must be a second-degree felony (here the felonious assault). If the jury found the cause to be a fourth-degree felony (here, aggravated assault), then defendant could be found guilty only of "voluntary manslaughter as defined in R.C. 2903.03, and not murder." *State v. Williams* (Sept. 6, 2001), Cuyahoga App. No. 78430, 2001 WL 1035160, at *2.

{¶ 33} From this record, it is not clear whether the jury was unanimous on the cause of death. The state presented two alternate theories of how defendant caused the victim's death: either she poisoned him[7] or she beat him to death. The jury both convicted and acquitted defendant of murdering the victim. In *United States v. Powell* (1984), 469 U.S. 57, 58, 105 S.Ct. 471, 83 L.Ed.2d 461, the

---

7. We note that although poisoning does not initially appear to be "an offense of violence," it does fit the definition of an offense of violence found in R.C. 2901.01.

court upheld its prior holding in *Dunn v. United States* (1932), 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, "that a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count."

{¶ 34} In the case at bar, however, the two verdicts are simple contradictions because nothing in the indictment, the bill of particulars, the jury instructions, or the verdict forms [8] indicates which version of the facts applies to which count of murder or even that one is based on a different set of facts. Both murder counts merely state that defendant "did cause the death of John McEwen, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, in violation of Section 2903.02 of the Revised Code." Without indicating whether the murder conviction was for the felonious assault with the camera or for the felonious assault with the antifreeze, one verdict simply says that she murdered the victim, and the other verdict acquitted her of murdering the victim. Nothing differentiates one count from the other. We do not know, therefore, whether an aggravated-assault conviction in place of a felonious-assault conviction would invalidate the murder conviction.

{¶ 35} Because of the faulty indictment and verdict forms, this court has no way of knowing which offense the jury decided was the cause of the victim's death. This inability to discern the jury's intent renders the faulty instruction reversible error.

{¶ 36} The record shows that the jury was confused not just by the aggravated-assault instructions but also by the identical murder counts. During deliberation, the jury requested the court to clarify counts two and three and expressly asked, "[D]o our verdicts have to be the same for both[?]" In response to this inquiry, the court proceeded to reread the instruction regarding reasonable doubt. The court then said: "Consider counts separately. The charges set forth in each count of the indictment constitute a separate and distinct matter. You must consider each count, and the evidence applicable to each count, separately, and you must state your findings as to each count uninfluenced by your verdict as to the other, or any other count." The court never clarified, however, the difference between the murder counts. The jury had no more information after the court reinstructed it than it had when it asked its question.

---

8. Specifically, the jury-verdict forms merely state that the jury found defendant guilty of murder "in violation of § 2903.02 of the Ohio Revised Code as charged in Count Two of the Indictment" and that the jury found defendant not guilty of murder "in violation of § 2903.02 of the Ohio Revised Code as charged in Count Three of the Indictment."

{¶ 37} The court's statement of the law—that each count of the indictment constituted a separate and distinct matter with evidence applying to the counts separately—contradicted the court's previous instruction that the two murder counts were identical in every respect. Further, following the jury's expression of confusion, the court provided nothing to the jury to differentiate between the two counts. As the Tenth District has explained: "The trial court has the discretion to determine what supplementary instructions should be given to the jury. * * * If, however, the jury's inquiry suggests confusion regarding a legal issue of some significance, the trial court should not rely on general statements from the prior charge, but should clarify the point of concern." *State v. Sales*, Franklin App. No. 02AP–175, 2002-Ohio-6563, 2002 WL 31689443, ¶ 16. In the case at bar the trial court failed to provide this clarification. This ambiguity requires vacating the conviction and reversing for a new trial.

Ordinarily, reversible error does not consist of misstatements or ambiguities in only part of the instructions. However, there is an article of legal faith amounting to a presumption that jurors listen to and follow the court's instructions in applying the law to the facts. * * * When a court gives a misleading or conflicting instruction(s), we are unable to indulge in that presumption and must reverse, even when applying "the jury instructions in their entirety" analysis.

*State v. Thompson* (Nov. 9, 1993), Ross App. No. 92CA1906, 1993 WL 472907, at *4.

{¶ 38} By erroneously instructing the jury that it could not consider aggravated assault if it found all the elements of felonious assault, the court prevented the jury from considering the alternative of manslaughter. Denying consideration of this alternative rendered the verdict invalid.

{¶ 39} Accordingly, the verdict is vacated and the case is remanded for a new trial.

Judgment reversed
and cause remanded.

CELEBREZZE, P.J., and GEORGE,* J., concur.

---

* Sitting by Assignment: Judge Joyce J. George, Retired, of the Ninth District Court of Appeals.