[Cite as *State v. Mack*, 2016-Ohio-6958.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO                                                    :
                                                                :
      Plaintiff-Appellee                                :     C.A. CASE NO. 26749
                                                                :
v.                                                              :     T.C. NO. 14CR2321
                                                                :
RAYMOND MACK                                                     :     (Criminal appeal from
                                                                :      Common Pleas Court)
      Defendant-Appellant                               :
                                                                :

. . . . . . . . . .

# O P I N I O N

Rendered on the ___23rd___ day of ____September____, 2016.

. . . . . . . . . .

MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JOHN S. PINARD, Atty. Reg. No. 0085567, 120 W. Second Street, Suite 603, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

RAYMOND MACK, Inmate #A716469, Pickaway Correctional Institute, P. O. Box 209, Orient, Ohio 43146
      Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the court on the Notice of Appeal of Raymond Mack,

filed April 14, 2016, pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18

L.Ed.2d 493 (1967). Mack pled no contest to one count of having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), (Count I), and one count of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), (Count II), both felonies of the second degree. Both counts were merged at sentencing, and Mack was sentenced on Count II to a prison term of 18 months, to be served concurrently with the sentences imposed in two other matters.

{¶ 2} Counsel for Mack asserts that he can find no meritorious issues for appellate review, asserting instead three "potential" assignment of error. This Court advised Mack that counsel of record filed a brief on his behalf and granted Mack 60 days to file a pro se brief assigning any errors for our review. Mack asserts three assignments of error herein.

{¶ 3} The record before us reflects that Mack filed a motion to suppress on September 24, 2014. At the start of the hearing thereon, the prosecutor indicated to the court that in the course of the traffic stop at issue, Mack made "statements in violation of Miranda." The prosecutor asserted that the statements "would not be able to be used in case in chief; however, we would argue that they were still voluntary; therefore, we would be able to use them in rebuttal."

{¶ 4} Jeffrey Tyler Orindorf testified that he is employed by the Dayton Police Department, and that on July 2, 2014, while on routine patrol with his partner, Joshua Bowling, he initiated a traffic stop of a vehicle driven by Mack that Orindorf observed "weaving in and out of traffic at a high rate of speed. * * * The vehicle was traveling in such a fast manner, road debris was almost like a cloud of dust." Orindorf observed Mack "traveling outside of the lines or passing on the left" with "[n]o turn signals that we

could see." Orindorf stated that Mack was traveling west on West Third Street at the time. He estimated that Mack "was doing 65 to 70" miles per hour.

{¶ 5} Orindorf stated that he activated his lights and siren and stopped Mack. According to Orindorf, Mack "began to reach around in the passenger side of his vehicle." The video from the officers' cruiser camera was played for the court. Orindorf testified that he approached the vehicle and asked Mack where he was going. Orindorf stated that Mack "stated that his sister had just had a heart attack." According to Orindorf, Mack "was very anxious, sweaty, had glossy bloodshot eyes, just things that I kind of kept in the back of my mind."

{¶ 6} Orindorf testified that he returned to his cruiser to check Mack's driver's license and determined that his license was valid. Orindorf stated that once he returned to his cruiser, "the subject began moving around, continuously moving around in the passenger side." According to Orindorf, "it's officer safety. He's continually moving around, he continues to reach into the passenger side of the vehicle. Just puts us on high alert once again for weapons." Orindorf stated that Bowling asked Mack "to stop moving and he continued to keep moving around and I went ahead and asked him to exit from the vehicle."

{¶ 7} Orindorf stated that when Mack exited the vehicle, he observed "an open bottle of Wild Irish Rose, liquor" in the center console. Orindorf stated that he "was able to smell an alcoholic beverage on his breath" that "was strong enough for me to smell." Orindorf stated that he "did a Terry patdown, just checked him for weapons. He was moving around a lot. Just wanted to make sure he did not retrieve a firearm from when he was moving around inside the vehicle." Orindorf stated he asked Mack "if he had any

guns, knives, needles [or] anything that would poke me, stick me, stab me or shoot me." Orindorf stated that Mack was not under arrest at the time but was detained in the course of the traffic stop.

{¶ 8} Orindorf stated that he placed Mack in his cruiser and "just basically began writing citations." Orindorf testified that he issued citations for "[m]arked lane violation and OVI." He stated that he asked Mack if there was anything inside his vehicle "that officers need to know about." When asked why he asked Mack about the contents of the vehicle, Orindorf responded, "once he was receiving his tickets he was going to be free to leave. Officers just want to make sure there is nothing inside the vehicle once he was placed back inside that he would be able to retrieve a firearm or weapon." Orindorf stated that he was in the front seat of the cruiser at the time and "Officer Bowling was in the passenger side window." The following exchange occurred:

Q. So while you were talking to him when he was in the car, did you receive any information about what was in the car?

A. I did.

Q. Anything of concern?

A. Yes. Officer Bowling, I had Officer Bowling do a protective sweep of the vehicle just because once he was going to get back in the vehicle after he received citations, make sure there was no weapon inside the vehicle that he would be able to retrieve.

Officer Bowling indicated that on the front passenger seat inside a brown paper bag was a firearm.

{¶ 9} In response to questioning from the court, Orindorf indicated that Mack

refused to consent to the search of the vehicle. He testified that the officers did not threaten Mack or make any promises to him. Orindorf stated that he believed Mack was under the influence of alcohol and that he accordingly could not allow him to drive from the scene. He stated that Mack had "bloodshot eyes, glossy eyes, the odor of the alcoholic beverage on his breath, his apparent nature, soiled clothes, sweaty."

{¶ 10} Orindorf identified the Dayton Police Department tow policy, pursuant to which officers "do what we call inventory of the vehicle, officer inventory, see if there are any items inside the vehicle." According to Orindorf, the purpose of the inventory is "so nothing gets stolen so we can account for every item inside the car as it was when the vehicle was taken from the traffic stop so that it's returned in the same manner when the subject picks up his vehicle from the tow lot." Orindorf stated that Mack's vehicle was towed from the traffic stop according to the policy.

{¶ 11} The following exchange occurred on cross-examination:

Q. But yet when Officer Bowling goes up and makes the sweep, and we can see this on the video, doesn't he go right into the car?

* * *

A. Yes.

Q. Did you have a warrant to do that?

A. We did not.

Q. And it wasn't until Officer Bowling actually went inside his car rummaging around in the car that the weapon was found, correct?

A. That is correct.

Q. And you had not even made the decision at that point in time

you were going to be citing him for OVI, had you?

A. Actually, it had began [sic] to trickle in my mind that he was under the influence. The more I talked to him, I began to get slurred speech. OVI is a very tricky thing. You have to have so much evidence.

Q. I understand.

A. It's not initial OVI.

Q. I understand but the point of my question was you had not made the decision at that point in time to cite him for OVI?

You were still formulating an opinion as to whether or not you had probable cause for that, weren't you?

* * *

A. I would say, yes, we were.

THE COURT: I'm sorry. So you had come to the conclusion that it was probable you were going to arrest him for OVI?

THE WITNESS: As I spoke to him, it was still coming. I don't recall exactly at what point OVI became 100 percent. I believe it was probably about - - it was somewhere in between the middle in between him getting out of the car and obviously before the end of the traffic stop but I don't have a definite answer of when he was under arrest for OVI is what I'm trying to get at.

THE COURT: Was it before or after the protective sweep that you had formulated the decision that he would be cited for OVI?

THE WITNESS: I would say the reason we did the protective sweep

was because we were trying to decide if he was going to be charged with the OVI. I would say the protective sweep would be for him to get back in the car so we had not yet formulated he was going to be under arrest for OVI.

{¶ 12} At the conclusion of Orindorf's testimony the following exchange occurred:

THE COURT: * * * My notes are that you testified on direct examination that you approached the car after the car stopped and the defendant is saying his sister had a heart attack * * *.

I think you testified at that point you noticed that he was anxious, sweaty, glossy, bloodshot eyes. And then you further went on to testify that you returned to the cruiser and see the movement and you come back to the vehicle and you order him out of the car and at that point you see the open container of alcohol.

And then I believe you testified you also at that point in time can smell alcohol and that it was a strong odor of alcohol.

And my question is at that point in time was it your - - did you have the intent that you were not going to let him return to the car and drive away?

THE WITNESS: Yes. Either way, he was not free to leave, to drive the vehicle. Whether he got a ride from someone else, he refused to do the field sobriety, he would have been arrested under summons and he would not be free to drive the vehicle.

Once he left the vehicle and I smelled alcohol on his breath, it was in my mind that he probably wasn't going to drive away from the vehicle.

Once he got back in the vehicle and started talking, slurred speech, his behavior being very anxious, sweaty, his clothing disheveled, soiled - - not soiled but it was obvious that he had been drinking.   * * *

{¶ 13} Joshua Bowling testified that he is a City of Dayton police officer, and that he was working with Orindorf on July 2, 2014.   He testified that in the course of the traffic stop he approached Mack's vehicle from the passenger side. He stated that he performed the protective sweep because "we were initially going to let him get back in the vehicle and he was going to be free to go so we began a sweep of the car."   Bowling stated that he "just looked where he could lunge, cracks would be on the left between the center console and the driver's seat, just initial lunge areas that I had looked in the passenger seat when I saw Mr. Mack reaching repeatedly during the traffic stop."   Bowling stated that he observed "a shiny metal in the passenger seat protruding out of a brown paper bag.   Through my experience and training, I immediately recognized that to be a firearm." Bowling stated that he advised Orindorf that he found the weapon.   He stated that he "actually told [Mack] to quit moving around one time but I didn't interact with him.   Officer Orindorf had most of the interaction."

{¶ 14} In overruling the motion to suppress from the bench, the court noted that defense counsel conceded that the officers lawfully stopped Mack's vehicle, and that the officers "had the automatic right to have the defendant step out of the vehicle."   The court noted that the video reflects Mack "engaging in these movements towards the passenger side."   The court determined as follows:

And so at the instant in time that the defendant was lawfully removed from the vehicle, the facts as I've listed the weaving in and out of the traffic,

the bloodshot eyes, the glossy eyes, the open bottle of Wild Irish Rose, the strong odor of alcohol on the defendant's breath, all of those facts constituted - - created a fair probability that the defendant had been driving under the influence and so there was at that point in time probable cause to arrest him.

Now, as the facts developed in the car, in the cruiser when the defendant is placed in the cruiser, there is this evidencing of the slurred speech which added even more to the probable cause but the probable cause already was established at the point that the defendant was driving under the influence when he was removed from the vehicle.

{¶ 15} Regarding the search of the vehicle, citing *State v. Caufield*, 2013-Ohio-3029, 995 N.E.2d 941 (2d Dist.), the court noted that this Court therein "held that the search incident to arrest does not apply because when the arrestee is locked in the cruiser, he is not within reaching distance of the passenger compartment. And so that cannot be a theory upon which the police can search a car incident to arrest. So search incident to arrest does not apply."

{¶ 16} Regarding the protective sweep, citing *State v. Henderson*, 2d Dist. Montgomery No. 16016, 1997 WL 691459 (Nov. 7, 1997), the court noted that "an officer may not conduct a weapons frisk of an automobile while the driver is locked in a cruiser unless the officer has finally determined to return the driver to the car." According to the court, once Orindorf made the decision not to return Mack to his vehicle "because obviously he had been driving illegally," Orindorf "did not have the authority to conduct a protective sweep so that does not justify allowing the search of the car."

**{¶ 17}** The court next noted, "that leaves us with the inevitable discovery doctrine" and found as follows:

* * *

Now, we have in the evidence the tow policy of the Dayton Police Department which is State's Exhibit 3. And I'm reading in relevant part Section 1, Roman Numeral I, When to Tow a Vehicle. A.

* * * "Vehicles operated by drivers while under the influence shall properly be towed from where they are stopped."

So, we have a situation where a vehicle was being operated by a person under the influence so it was permissible to tow the vehicle so it was a lawful impoundment. There was no other individual at the scene who could take custody of the vehicle.

Then, under that same policy, State's Exhibit 3, under Roman Numeral IV-B as in boy, inventory of a towed vehicle.

Inventory property inside the vehicle's passenger compartment shall be done prior to towing. Secure all property inside the vehicle except money and valuable things.

So, and under A, Roman numeral IV-A, it says: Prior to towing a motor vehicle, conduct an inventory of the vehicle's contents. Again, that includes passenger compartment. So, the policy allows the inventory within the passenger compartment area.

**{¶ 18}** The court concluded "by a preponderance of the evidence that the gun would have inevitably been discovered pursuant to the lawful towing and lawful inventory

of the vehicle because there was probable cause to arrest the defendant for OVI and, in fact, he was arrested." The court noted that Mack "didn't say, my gun is in the car. He makes no such statement but, in any event, the gun inevitably would have been discovered because of the inventory irrespective of any statement the defendant made. So, fruit of the poisonous tree doesn't apply."

{¶ 19} The court further concluded that there was "a relatively brief detention while all of this investigation is on-going so the Court does not find not find there was any unnecessary detaining or any detaining beyond the scope of the original stop." Finally, the court considered Mack's statements in the cruiser and noted that "the issue is whether they were involuntary statements and, therefore, if they were involuntary, the state couldn't use it even in rebuttal at trial." The court noted that it "viewed along with counsel the DVD of what was said and the Court notes that there was not physical deprivation or mistreatment. There was no threat by the police." The court concluded by a preponderance of the evidence that Mack's statements in the cruiser were voluntary; "therefore, although the Miranda violation does apply but in the event the defendant were to testify at trial, * * * the prosecutor could then use any inconsistent statements in rebuttal."

{¶ 20} The record reflects that at his plea hearing Mack agreed to plead no contest to the weapons charges above, as well as to plead guilty to a charge of possession of cocaine in another matter (2014 CR 3306), a fifth degree felony offense, in exchange for a sentence within an agreed upon range of 12 to 18 months. At sentencing, the court noted that Mack had also pled guilty to another possession of cocaine charge (2015 CR 717).

{¶ 21} Counsel for Mack's first potential assignment of error is as follows:

APPELLANT IS UNABLE TO HAVE HIS PRISON SENTENCE VACATED OR REDUCED (BEST POSSIBLE CASE REMANDED) DUE TO THE AGREED SENTENCE OF 12-18 MONTHS AT THE JUDGE'S DISCRETION.

{¶ 22} R.C. 2953.08 governs appeals based on felony sentencing guidelines, and R.C. 2953.08(D)(1) provides as follows: "A sentence imposed upon a defendant is not subject to review under this section if the sentence is authorized by law, has been recommended jointly by the defendant and the prosecution in the case, and is imposed by a sentencing judge." "The General Assembly intended a jointly agreed-upon sentence to be protected from review precisely because the parties agreed that the sentence is appropriate. Once a defendant stipulates that a particular sentence is justified, the sentencing judge no longer needs to independently justify the sentence." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 25. We agree that this "potential" assignment of error lacks merit, and it is overruled.

{¶ 23} Counsel for Mack's second potential assignment of error is as follows:

PROBABLE CAUSE DID NOT EXIST FOR THE ARREST BECAUSE THE TOTALITY OF THE CIRCUMSTANCES DID NOT ARISE TO PROBABLE CAUSE FOR OVI.

{¶ 24} As this Court has previously noted:

In deciding motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*

(1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (citation omitted). Consequently, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

*State v. Wells*, 2d Dist. Montgomery No. 20798, 2005-Ohio-5008, ¶ 7.

**{¶ 25}** " 'Probable cause exists when a reasonably prudent person would believe that the person to be arrested has committed a crime.' *State v. Dickey*, 2d Dist. Darke No. 99CA1482, 1999 WL 397183, *2 (June 18, 1999). The existence of probable cause is determined by looking at the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 230–232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *State v. Mendell*, 2d Dist. Montgomery No. 24822, 2012-Ohio-3178, ¶ 9. R.C. 4511.19(A)(1) provides: "No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply: (a) The person is under the influence of alcohol, a drug of abuse, or a combination of them."

**{¶ 26}** The record reflects that the trial court credited Orindorf's testimony regarding Mack's condition and considered the totality of the circumstances in finding probable cause existed for Mack's arrest for OVI, namely Mack's erratic driving, the presence of an open container of alcohol in his vehicle, his bloodshot, glossy eyes and odor of alcohol on his breath, and his slurred speech. We agree with the State that this potential assignment of error lacks arguable merit.

**{¶ 27}** Counsel for Mack's third potential assignment of error is as follows:

INEFFECTIVE ASSISTANCE OF COUNSEL.

**{¶ 28}** As this Court has previously noted:

To establish a claim for ineffective assistance of counsel, the defendant has the burden of demonstrating that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) there is a reasonable probability that the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *State v. LeGrant*, 2d Dist. Miami No. 2013–CA–44, 2014–Ohio–5803, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness, and that counsel's deficiencies were serious enough to create a reasonable probability that, but for the deficiencies, the result of the trial would have been different.

*State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 7.

**{¶ 29}** "In general, only ineffective assistance of counsel relating to the plea proceeding, itself, will survive a plea of guilty or no contest." *State v. Fitzgerald*, 2d Dist. Greene No. 2001-CA-124, 2002-Ohio-3914, ¶ 43. At the start of Mack's plea hearing, the trial court recited the plea agreement for the three charges and ascertained that counsel for Mack and Mack understood the agreement as recited. The record further reflects that the court engaged in a complete Crim.R. 11 plea colloquy before accepting Mack's pleas. Mack's plea form indicates that his pleas are voluntary and made without coercion,

threats, force or promises. We agree with the State that ineffective assistance of defense counsel is not demonstrated, and that this potential assignment of error lacks arguable merit.

**{¶ 30}** We will next address Mack's pro se assignments of error. His first assigned error is as follows:

THE DAYTON POLICE OFFICER VIOLATED THE DEFENDANTS [sic] FOURTH [sic] & ARTICLE I §§§ 10, 14, & 16 RIGHTS OF THE OHIO CONSTITUTION AND THE FOURTH, FIFTH, SIXTH, & FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION WHEN THE OFFICERS SEARCHED THE DEFENDANTS [sic] VEHICLE WITHOUT A SEARCH WARRANT OR WITH THE CONSENT TO SEARCH THE VEHICLE.

**{¶ 31}** Mack asserts that the officers failed to conduct any field sobriety tests, and if they would have done so "their training would have shown that the appellant would not be over the legal limit to operate a motor vehicle." Mack asserts that once Orindorf determined that his license was valid he should have issued Mack a traffic citation and released him, instead of prolonging the stop. Mack asserts that "the search incident to arrest exception to the warrant requirement does not apply to the vehicle in this case, and cannot be used to justify the search of the appellant's vehicle."

**{¶ 32}** As determined above, the officers had probable cause to arrest Mack for OVI. As this Court has previously noted:

Under the inevitable-discovery doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately

or inevitably would have been discovered by lawful means * * * then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix v. Williams* (1984), 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377; *State v. Perkins* (1985), 18 Ohio St.3d 193, 195–196, 480 N.E.2d 763. The rationale behind the inevitable-discovery doctrine is that the prosecution should not be placed in a worse position because of earlier police misconduct where the evidence in question would have inevitably been discovered absent the police misconduct. * * *

*State v. Hunter*, 153 Ohio App. 3d 628, 2003-Ohio-4204, 795 N.E.2d 139, ¶ 20 (2d Dist.).

**{¶ 33}** The standardized, written tow policy of the Dayton Police Department was admitted into evidence, and the trial court properly determined that the weapon would inevitably have been discovered in the course of the inventory search required by the policy due to Mack's arrest for OVI.   Mack's first assigned error lacks arguable merit.

**{¶ 34}** Mack's second assignment of error is as follows:

THE DAYTON POLICE OFFICERS VIOATED THE APPELLANT'S SIXTH & FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION & ARTICLE 1, §§ 10, 16 OF THE OHIO CONSTITUTION BY CONDUCTING IMPROPER PROCEDURES IN THIS PRESENT CASE.

**{¶ 35}** Mack repeats the arguments raised in his first assignment of error, namely that the officers failed to perform field sobriety tests, and the "so called protective sweep of his vehicle after placing him in the cruiser was not proper and cannot later be justified, even though the vehicle was about to be impounded."   For the reasons set forth above,

this assignment of error lacks arguable merit.

{¶ 36} Mack's third assignment of error is as follows:

THE DAYTON POLICE OFFICER VIOLATED THE DEFENDANTS [sic] ARTICLE 1 §§§ 10, 14, & 16 RIGHTS OF THE OHIO CONSTITUTION AND THE FOURTH, FIFTH, SIXTH, & FOURTEENTH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION WHEN THE OFFICERS DID NOT MARANDARIZE [sic] THE APPELLANT BEFORE QUESTIONING HIM WHILE IN THE BACK SEAT OF THE POLICE CRUISER.

{¶ 37} Mack asserts that the State "has relied on the notion that the appellant confessed to having a weapon in his vehicle. There is no such statement." Mack asserts that he "was not free to leave and was handcuffed in the backseat of the cruiser being questioned, without being mirandarized." [sic] The State conceded at the start of the hearing that Mack made statements in violation of his *Miranda* rights. The trial court determined that the statements were voluntarily made, and Mack does not assert otherwise in his brief.

{¶ 38} As this Court has previously noted:

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at

164. "Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger [a] totality of the circumstances analysis." *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). A confession is voluntary "absent evidence that [the defendant's] will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002–Ohio–4680, ¶ 20. *See also State v. Buk–Shul*, 2d Dist. Montgomery No. 23603, 2010–Ohio–3902, ¶ 9. The voluntariness test considers "the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Jackson* at ¶ 21. This includes factors like "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." *Id.*

State v. Banks-Harvey, 2d Dist. Montgomery No. 26786, 2016-Ohio-4715, ¶ 8.

{¶ 39} We have reviewed the DVD of the traffic stop, and we agree with the trial court that Mack did not confess that his gun was in his car. Mack's statements while in custody after the gun was retrieved from the car would have been inadmissible in the State's case in chief, as the State asserted at the suppression hearing, since Mack was not advised of his rights at that time. We further agree with the trial court that there was no threat, mistreatment or deprivation by the officers. The officers did not display their weapons, and we conclude that Mack's self-determination was not impaired by coercive

police conduct, and that his statements were accordingly voluntary. "Under *Harris v. New York* (1971), 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, the state can use an accused's voluntary, but un-Mirandized statement to impeach trial testimony," as the State asserted at the hearing. *State v. Hill,* 75 Ohio St.3d 195, 661 N.E.2d 1068 (1996). We conclude that Mack's third assignment of error lacks arguable merit.

{¶ 40} Having thoroughly reviewed the entire record pursuant to *Anders,* we conclude that this appeal is wholly frivolous. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Meagan D. Woodall
John S. Pinard
Raymond Mack
Hon. Dennis J. Langer